NASCO, INC., Plaintiff-Appellee, *v.* DAHLTRON CORPORATION, Defendant-Appellant.

Second District  No. 78-531

Opinion filed July 18, 1979.

Graves, Greenwald, Maier and Miner, of Rockford, for appellant.

Thomas D. Luchetti, of Miller, Hickey and DeBruyne, of Rockford, for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

The Dahltron Corporation, defendant, appeals from a judgment in the amount of $43,140.97 awarded to the plaintiff, Nasco, Inc., for alleged breach of an installment sales contract. In issue is whether the trial court erred in finding that Dahltron was guilty of an anticipatory breach of contract and whether the amount of the judgment is supported by the evidence.

In 1974 Dahltron was engaged in the marketing and sale of an invention known as "Tork-Ak," a device "intended to be used for applications requiring a slowing down mechanism from a power source without loss of torque power." Beginning in the spring of 1974 Nasco, Dahltron and the inventor held meetings at which they discussed the possibility of Nasco manufacturing the devices; and Dahltron supplied Nasco with specifications upon which to base price quotations. Nasco, after several preliminary quotations, sent the following to Dahltron on September 16, 1975:

"Supercedes [*sic*] previous quotation on this part,

| 500 or more | 1″ Tork-Ak, assembled in box with 501-0101-B Hub | $55.00 ea |
|---|---|---|
| 500 or more | 1″ Tork-Ak, assembled in box with 501-0103 Hub | $46.85 ea" |

The reverse side of Nasco's quotation form states:

"No.2-QUOTATIONS: * * * Until an order is accepted by Seller, quoted prices are subject to change without notice. All quotations unless otherwise stated are for immediate acceptance. Unless

called for by customer's specifications, prices quoted do not include burring. All orders and contracts subject to acceptance at Seller's home office.

\* \* \*

No.4-CANCELLATION: Orders may be cancelled or deliveries deferred only upon the condition that the Buyer assume immediate liability and make payment to the Seller for all work complete at the unit price; work in process on the basis of the percentage of completion thereof times the order unit price; raw material, unamortized tooling, engineering and other cancellation charges incurred on the basis of cost to the Seller plus handling and overhead charges. All cancellation charges to be determined at the time of cancellation or deferment."

On October 3, 1975, Dahltron sent Nasco purchase order No. 05-368 pursuant to the September 16 quotation, which stated:

"100     1" TORK-AK Assembled in box with Black Oxide finish                                    $55.00/Unit

Units to be delivered A.S.A.P.

900     1" TORK-AK 501-0101 B HUB release per our schedule to be determined after receipt of initial shipment

8,000 lbs. 4-½" Rd 1215
1,000 lbs. 3" Rd 1215
To be sent by Dahltron with payment terms extended to Net 90 days."

Upon receiving this purchase order Nasco began preparation for the production of 1000 assembled units of the Tork-Ak device. Further, there was evidence that Dahltron knew that Nasco was beginning production.

At some time after October 3, 1975, Nasco shipped 25 Tork-Ak units to Fleetwood Systems, Inc., a customer of Dahltron. These units were returned to Dahltron because they would not work. According to Melvin Underhill, an officer of Nasco, the 25 units would, if operated, "hammer [themselves] to pieces." It became obvious that there was a defect in the design of the Tork-Ak unit, although there did not appear to be any defect in workmanship which could be attributed to Nasco. It became clear that the original design and specification for the Tork-Ak unit was faulty. A new design was then developed.

A "purchase order" from Dahltron, dated January 19, 1976, directed to Nasco contained the description "THIS PURCHASE ORDER

CANCELS IN FULL PURCHASE ORDER 05-368" (the October 3, 1975, purchase order). On the same date Dahltron sent Nasco a purchase order:

"454 TA-100 units—Xylan coated—Packaged—Tested 59.87."

The order form also described several special things that Nasco was to do. It specified that

" * * * all future units must be Xylan coated, have oversize rollers per John Lundin, and be individually tested. Each unit must have a minimum stall torque of 1200 in. lbs. to be certified by Rams. All inner hubs are to be ground in the three support slots for the oversize rollers. Nasco is to invoice Dahltron for 227 units on 03/01/76 minus what has shipped prior to 03/01/76 terms net 30. Balance of units are to be invoiced on 04/01/76 net 30. All finished units are to be sent to Rams Rockford with packing slips to Dahltron, Oak Brook."

It also appears from the evidence that "Rams" is a firm in Rockford which tests devices for adequacy of performance and with which John Lundin was connected.

With regard to Dahltron's "purchase order" 05-368 dated October 3, 1975 (purporting to respond to Nasco's September 16, 1975, quotation), Mr. Underhill, an officer of Nasco, testified as follows:

"Q Now, showing you what's been marked as Plaintiff's Exhibit No. 8, that purchase order was counseled [sic] by agreement between Nasco and Dahltron, is that not correct?

MR. LUCHETTI: Object.

THE COURT: Overruled.

A: There was no agreement. We suddenly received the cancellation.

Q [By Mr. Greenwald]: Is it not true that Nasco Corporation accepted the cancellation submitted by Dahltron Corporation shown and that cancellation being Plaintiff's Exhibit No. 12?

* * *

A: We accepted it according to the terms of our quotation."

There was also evidence that on February 23, 1976, Mr. Underhill of Nasco sent a letter to Dahltron in which he explained the progress that was being made in the construction of the 454 units. The letter also contained the following statement:

"We would seek advance payment of approximately $28,000.00, which we now have in accounts payable to our good outside vendors. Due to the aforementioned problems, these payables are approaching four months overdue. Our margin, due to problems described here, will be zero on this first 500 units. We are confident future potential of the product will more than compensate us for this."

(On or about February 25, 1976, Dahltron sent Nasco a $1000 advance payment.)

Also, on February 23, 1976, Nasco sent Invoice No. 1335 to Dahltron for five units it had shipped for inspection to Rams Rockford, in the amount of $324.35. On March 8, 1976, Invoice No. 1336 was sent to Dahltron for several more units that had been shipped for inspection to Rams Rockford. This invoice was also for $324.35. On April 9, 1976, Dahltron made a payment to Nasco of $648.70, which was apparently payment in full of Invoices 1335 and 1336.

On April 20, 1976, Nasco sent Invoice No. 1477 to Dahltron for $1,297.40. It does not appear that Dahltron took any action towards paying this invoice.

On August 10, 1976, Nasco wrote Dahltron, demanding payment of $31,703.81, computed in an attached Invoice No. 1790:

| DESCRIPTION | Quantity Shipped | Price | Amount |
|---|---|---|---|
| P/N 501-0103 A, Retaining Ring | 2,200 | .75 ea | 1,650.00 |
| P/N 501-0104 A, Split Ring | 1,100 | .55 ea | 605.00 |
| P/N 501-0102 B, Drive Lever | 2,098 | 3.08 ea | 6,461.84 |
| P/N 501-0101 B, Hub | 589 | 25.00 ea | 14,725.00 |
| P/N 501-0101 A, Drive Ring | 1,064 | 5.55 ea | 5,905.20 |
| Springs | 15,500 | .02 ea | 310.00 |
| Teflon Holders | 13,500 | .084 ea | 1,134.00 |
| Rollers | 2,200 | .10 ea | 220.00 |
| Boxes | 530 | .40 ea | 212.00 |
| Screw and lock washers | | | 480.77 |
| | | | 31,703.81 |

The letter justified the demand based upon the cancellation clause contained in the initial quotation. The letter concluded that no further work would be done without payment in advance. Dahltron responded by denying liability and cancelled remaining purchase orders. This suit followed.

Essentially, the trial court concluded that Nasco was entitled to demand $28,000 from Dahltron on February 23, 1976, and therefore entitled to terminate the contract when payment was not made. The trial judge, apparently on his own motion, interpreted the February 23, 1976, letter from Nasco to Dahltron as a demand for "adequate assurance of performance" as defined in section 2—609 of the Uniform Commercial Code. (Ill. Rev. Stat. 1975, ch. 26, par. 2—609.) We first address Dahltron's contention that it had not committed any anticipatory breach of contract and that reasonable grounds for insecurity did not, in fact, exist, even

assuming, which it denies, that the letter constituted a request for assurances.

Before reaching the essential issue, however, we must consider the nature of the transaction between the parties since that is in some dispute. From an examination of the quotation of prices forms furnished by Nasco it appears that they are solicitations, and not necessarily offers to sell, since they provide that the quoted prices are subject to change without notice and further are subject to acceptance at seller's home office. Dahltron has seized upon this language to argue that the initial contract did not include the terms on the reverse side of the quotation forms, because the quotations were not offers but mere solicitations. While from the view which we take of the transactions we do not find this argument to be material, we note that another provision of the quotation form states that "all quotations * * * are for immediate acceptance," which suggests that the offer will ripen into a contract upon acceptance.

■■ ■ Dahltron also contends that it agreed to purchase only 100 units initially, not 1000, in its purchase order dated October 16, 1975. We cannot agree with Dahltron's argument that it merely ordered 100 units and that the further reference to 900 units was merely an indication of what it might further order in its discretion. The notation with reference to the 900 units appears on the order form immediately after the order of the 100 units to be furnished "as soon as possible." It therefore appears that Dahltron did make a binding commitment to order 900 units at some time. Further, it is noted that the last quotation of prices form received from Nasco gave a price of $55 per unit only where the purchaser ordered 500 units or more. In the initial order Dahltron listed the price of the 100 units at $55 per unit thus supporting the fact that more than 100 units were being ordered. While the time for the production of the 900 additional units was not stated, the order was referenced to a schedule to be worked out; and the law would imply that performance of the contract would be within a reasonable time. *Yoder v. Rock Island Bank*, 47 Ill. App. 3d 486, 491 (1977). See also Ill. Rev. Stat. 1975, ch. 26, par. 1—102(3).

A question then arises as to the effect of Dahltron sending the order form to Nasco on January 19, 1976, purporting to cancel the previous order which we have construed was for the 1000 units. At that time only 25 of the units had been produced and these had been rejected by the ultimate customer, not because of Nasco's fault but because of Dahltron's design failure. Dahltron seeks to interpret the cancellation as a mutual rescission of the original contract but the record does not support this view. Nasco's officer, Underhill, testified that there was no agreement to rescind and that Nasco considered the writing to be a cancellation by Dahltron which was accepted "according to the terms of our quotation." The letter appears to be a statement to Nasco that Dahltron no longer

wished to receive the products it had originally ordered, but it does not follow that Nasco therefore waived any right it might have to proceed under the previous agreement.

■■ Even if it were assumed that defendant's order was merely an offer to buy goods it would appear that a binding contract came into being when the plaintiff Nasco began to execute the defendant's order. The evidence shows that upon receiving the purchase order from Nasco dated October 3, 1975, Nasco began preparation for the production of 1000 assembled units of the Tork-Ak device; and further, that Dahltron knew that Nasco was beginning production. Section 2—206 of the Uniform Commercial Code provides as material:

"(1) Unless otherwise unambiguously indicated by the language or circumstances

(a) An offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances;

(b) an order * * * to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods * * *

(2) Where the beginning of a requested performance is a reasonable mode of acceptance an offeror who is not notified of acceptance within a reasonable time may treat the offer as having lapsed before acceptance." (Ill. Rev. Stat. 1975, ch. 26, par. 2—206.)

And section 2—207(3) of the Code provides:

"Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act." (Ill. Rev. Stat. 1975, ch. 26, par. 2—207(3).)

It thus appears that the terms appearing on the reverse side of the quotation of prices form of Nasco became a part of the contract of purchase entered into by Nasco and Dahltron and that Nasco therefore became entitled to cancellation charges on January 19, 1976. While it does not appear that Nasco demanded such charges until at least August 19, 1976, nor that the charges were tallied at the time of the January 19 cancellation, this computation remains an issue yet to be decided. It is, of course, somewhat complicated by the fact that much of the equipment that Nasco had purchased for use in building the first 1000 Tork-Ak units

could be used in the construction of the 454 Tork-Ak units ordered on January 19, 1976.

The so-called cancellation notice did not terminate further dealings between the parties. On the same date of January 19, 1976, Dahltron sent a new order with different terms for production related to 454 units. The record shows that Nasco was in production on this new order when it sought the advancement of $28,000 in its February 23, 1976, letter.

■■ ■ In deciding the effect of the February 23 letter, we cannot agree with the conclusion of the trial court that it was in effect a demand for assurance of performance described in section 2—609(4) of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 2—609(4)). That section provides:

> "(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

However, the letter requesting the $28,000 did not appear in any sense to be a request for an assurance of performance. It did not ask Dahltron to post a bond to guarantee its performance or make its corporate books available to Nasco for inspection; rather, it merely requested a large advance. Further, the right to adequate assurances under section 2—609 only arises where some event has occurred between the time of contracting and the time of the demand for the assurance, which causes the party making the demand to have some feeling of insecurity. (See, e.g., *Pittsburg-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 581 (7th Cir. 1976).) Here, there does not appear to have been any occurrence between January 19, 1976, and February 23, 1976, which could give Nasco grounds for insecurity. The letter, in effect, is merely a request for an advance payment.

Nor do we find support for the judgment on any other ground. There is insufficient proof in the record that Dahltron, at the time of Nasco's "cancellation" on August 10, 1976, was otherwise in breach of its contractual agreements. The record shows that on February 23, 1976, Nasco sent Invoice No. 1335 for $324.35 to Dahltron for five units it had shipped for inspection to Rams Rockford; and on March 8, 1976, sent Dahltron Invoice No. 1336 for $324.35 for several more units that had been shipped for inspection to Rams Rockford; that on April 9, 1976, Dahltron made a payment to Nasco of $648.70. This payment was apparently payment in full of Invoices 1335 and 1336. On April 20, 1976, Nasco sent Invoice No. 1477 for $1,297.40 to Dahltron. While the terms of the purchase order required payment in full within 30 days it is questionable whether even this invoice was in default. On April 28, 1976, Nasco sent

Invoice No. 1498 to Dahltron for $583.83. The two invoices total $1,881.23 and the records show that Dahltron had advanced $1,000, leaving a balance of $881.23. However, no credit had been given for approximately $6,000 worth of steel shipped to Nasco by Dahltron.

Additionally a further question is raised by the record which the trial court did not address. It is not clear that payment was due prior to the certification by Lundin. If payment were not due until certification by Lundin, the 30-day period would not begin to run until certification took place.

But it is also not clear from the record when Lundin in Rockford certified the units that had been sent to him, although Dahltron argues that Lundin did not complete his testing until July 19, 1976. If this is correct it would appear that Dahltron might not have become obligated to pay the April 20 and April 28 invoices totaling $1,881.23 until at least August 18, 1976, *i.e.*, until 30 days after certification. And in that event, Nasco's letter of August 10, 1976, in which it repudiated the contract would have been wrongful.

To the extent that the agreement may be considered ambiguous as to when Dahltron would be required to pay, section 2—310(a) of the Uniform Commercial Code is instructive in its provision:

"Unless otherwise agreed

(a) payment is due at the time and place at which the buyer is to receive the goods even though the place of shipment is the place of delivery; * * *." (Ill. Rev. Stat. 1975, ch. 26, par. 2—310(a).)

Further, if Lundin was not an agent of Dahltron for acceptance of delivered goods (an issue to be decided by the trial court upon remand), then it would appear that "delivery" would not have taken place until the Tork-Ak units were transmitted to Dahltron or its designee in Oak Brook. However, the record does not reflect when, if ever, the Tork-Ak units, represented by the April 20 and April 28 invoices, were delivered to Dahltron or its designee. Thus, in the absence of evidence of a contrary understanding, Dahltron was not obligated to pay the invoices until "delivery." Further, unless Lundin was an agent for Dahltron for the acceptance of delivered goods, the units would not have been delivered until placed in the hands of Dahltron or its designee; and the 30-day payment period accordingly would not have begun to run until such delivery.

Additionally, Nasco's claim that Dahltron owed it $43,140.97 as of August 10, 1976, apparently represents both work done and parts purchased on the original order of October 3, 1975, and the order of January 19, 1976, although the costs are not broken down as between the two orders; and the trial judge does not appear to have made any specific findings as to what portion of the $43,140.97 claimed by Nasco could be

assigned as cancellation charges arising from the cancellation of January 19, 1976.

■■ In summary, we conclude that the cause must be remanded (1) to determine the extent of Dahltron's obligation under the cancellation clause as to the initial order. If no such computation was made at or about the time of cancellation, or if it is no longer possible to determine the exact cancellation costs as of January 19, 1976, the trial court will compute damages under condition Number 4, "bearing heavily * * * upon [the party, here Nasco] whose inexactitude [would be] of [its] own making" (*Cohan v. Commissioner of Internal Revenue*, 39 F.2d 540, 544 (2d Cir. 1930); *cf. Sinclair Refining Co. v. Department of Revenue*, 50 Ill. 2d 201, 208-09 (1971); *cf.* also *Lakeland Construction Co. v. Department of Revenue*, 62 Ill. App. 3d 1036, 1040-41 (1978)), and (2) as to the second order, to find whether Dahltron failed to pay the April 20 and April 28 invoices when due. This determination may depend on whether Lundin certified the units shipped to him under the invoices and whether he in turn delivered these units to Dahltron or its designee in Oak Brook and may depend also upon whether Lundin can be regarded as the agent of Dahltron for the acceptance of the goods. If the trial court determines that at some time on or before July 11, 1976 (*i.e.*, 30 days before Nasco "cancelled"), Dahltron became obligated to pay one or the other or both of the invoices represented by the April 1976 invoices and failed to do so by August 10, 1976, when the cancellation on August 10, 1976, of the contract of January 19, 1976, by Nasco, was rightful; but if it finds that Dahltron did not breach any aspect of its contract of January 19, 1976, Nasco's anticipatory repudiation of August 10, 1976, would be wrongful. Nasco in that event could not recover from Dahltron for the failure of that contract. (3) Further, if the trial court finds that Nasco wrongfully and anticipatorily breached the contract of January 19, 1976, on August 10, 1976, it will have to determine the damages that accrued to Dahltron by reason of a lost opportunity to have some or all of its "cancellation charges," arising from Dahltron's cancellation, on January 19, 1976, of the contract of October 3, 1975, mitigated. This amount would have to be set off against the amount of money found to be due Nasco as "cancellation charges" under condition Number 4, for cancellation by Dahltron of the contract of October 3, 1975.

The judgment is therefore reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded with directions.

RECHENMACHER and LINDBERG, JJ., concur.