LYNTEL PRODUCTS, INC., *et al.*, Plaintiffs-Appellees, *v.* ALCAN
ALUMINUM CORPORATION, Defendant-Appellant.

First District (3rd Division)    No. 79-498

Opinion filed September 2, 1981.—Rehearing denied July 28, 1982.

Frederic F. Brace, Jr., Charles W. Douglas, and William J. Nissen, all of
Sidley & Austin, of Chicago, for appellant.

Lawrence A. Salibra, of Cleveland, Ohio, and Patrick J. Agnew, of Chicago,
for appellees.

JUSTICE McGILLICUDDY delivered the opinion of the court:

This action was brought by Lyntel Products, Inc. (Lyntel) and Brian
C. Egan, the plaintiffs, against Alcan Aluminum Corporation (Alcan), the
defendant. The trial court entered judgment for the plaintiffs in the
amount of $100,000 at the conclusion of a bench trial and subsequently
denied defendant's post-trial motions to vacate and modify the judgment.

On appeal the defendant contends that the trial judge decided the
case on a theory not raised in the plaintiffs' complaint; that the theory

applied by the court was not supported by the manifest weight of the evidence; and that the trial court erred in denying defendant's post-trial motion to modify the judgment.

The plaintiffs' theory of liability in the instant case was that Alcan breached its contract with Lyntel. Alcan denied liability contending that there was no contract because the condition precedent to Alcan's acceptance of Lyntel's order, the payment of $10,000 "front money" by Lyntel, was never performed.

Lyntel was organized by Egan to market Pizza Perfect, a kit containing a perforated metal pan, serving tray, cutting knife spatula and recipes for the preparation of pizza at home. It was sold on a guaranteed sale basis in retail outlets[1] during the Christmas season.[2] In May of 1972, Chicago Metallic, a division of Alcan, agreed to manufacture the metal pans and cutter/spatula units. The payment terms specified in the agreement called for cash in advance on the initial order and "one-half cash in advance and one-half net 30-days" on the following order. Lyntel placed orders in October and November of 1972, and payments were made in accordance with this agreement. Another order was placed with Alcan on January 3, 1973, and the payment arrangement was 50% cash in advance, with the balance to be paid net in 30 days. These payments were also made.

On June 19, 1973, Lyntel ordered 40,000 pans and cutter units at a price of $23,728.40 with instructions to ship the goods on or before October 1, 1973. An agreement reached between Egan and Gary Brabac, the sales manager for Alcan, called for the payment of $3,728.40 in September when Alcan received the raw materials and $20,000 in January 1974. Lyntel made payments in September 1973 and January and February 1974.

Egan testified that in January 1974 he met with Bud Dungan, national sales manager for Alcan, and Robert Farmer, production manager of Alcan, to discuss the terms for his anticipated order of 100,000 units. Farmer indicated that this large order would require an early ordering of raw materials due to a steel shortage. Egan submitted his order at a cost of $59,321 on May 13, 1974, and requested a shipment date of no later than October 1, 1974.

Egan stated that prior to the mailing of the May 13, 1974, order, he

---

[1] When a product is marketed on a guaranteed sales basis, the retailer pays nothing for advertising or to have the product placed in his store. When the product is sold, he keeps a percentage of the sale price and remits the remainder to the manufacturer.

[2] Due to the seasonal nature of Pizza Perfect, Egan was required to plan his advertising schedule and enter into contracts with retail outlets and producers of the kit materials well in advance of Thanksgiving.

had telephone conversations with Dungan and Farmer. He testified that Farmer said he would order the raw materials immediately upon receipt of Lyntel's purchase order. Egan desired to pay the entire order price in January 1975 after his accounts receivable for the 1974 Christmas season were received. Dungan thought there would be no problem with credit and told Egan to submit the order. Thereafter, Egan discussed credit arrangements with James Hennigan, the assistant regional credit manager for Alcan; and a meeting was set for June 10, 1974. Present at this meeting were Egan, Hennigan, Dungan, and Robert Buck, Alcan's regional credit manager. Egan testified that the parties agreed that, if Lyntel reduced its order to a cost of $40,000, credit in the amount of $30,000 would be extended until January 1975 and that the remainder would be due in September 1974 when the raw materials were received by Alcan. Egan stated that all the parties understood that the units were needed for a guaranteed sales program during the 1974 Christmas season. Egan submitted a revised order on June 12, 1974, in the amount of $37,791. The order was for 100,000 pans, having an altered design and a lesser per unit cost. Shipment was to be made on or before September 15, 1974.

On July 16, 1974, Egan met with Dungan at a housewares show and was informed that Alcan did not have the metal to fill Lyntel's order due to a steel shortage. Egan testified that Dungan suggested the possibility of obtaining steel from the black market at inflated prices and said Alcan needed an additional $23,000 from Egan in two days. Egan told Dungan that it would be impossible, and on August 1, 1974, Egan received a letter from Alcan cancelling Lyntel's order due to its failure to make advance payment to Alcan for raw materials.

Egan testified that he was never told that the raw materials would not be ordered until he made an advance payment. Had he been asked, he could have made an advance payment in an amount up to $10,000.

James Hennigan, defendant's assistant regional credit manager, testified that when a purchase order requiring credit approval is received, it is forwarded to the credit department. Once credit is approved, the order is sent to the production department so that necessary raw materials could be ordered and production scheduled. When Lyntel's purchase order for 100,000 items was received, it was forwarded to the credit department. Hennigan stated that in May of 1974 he examined Lyntel's credit file and called Egan on May 28 to discuss alternative forms of credit. No agreement was reached at that time.

At the June 10 meeting, Hennigan repeated the proposals for the extension of credit to Lyntel. When Egan suggested reducing his order to $40,000, Hennigan and Buck said $30,000 credit could be extended but that $10,000 front money would have to be paid before the metal was ordered. According to Hennigan, there was no discussion of the avail-

ability of raw materials at this meeting. Hennigan's notes of this meeting mentioned front money but did not indicate when the front money had to be paid. He stated that his notation "$10,000 front money by 9/15" was a proposal that was not agreed to by Alcan. Hennigan testified that, if Egan had paid Alcan the $10,000 on or about July 16, 1974, Alcan could have obtained the necessary raw materials.

Ferne "Bud" Dungan testified that prior to July 1975 he was national sales manager of the housewares division of Alcan. He had no authority to grant credit and made no credit commitments to Egan. Dungan stated that, at the June 1974 meeting, Egan was told that he would have to make an advance cash payment before any metal could be ordered by Alcan for Lyntel's order. Dungan could not recall how much front money was required. Dungan stated that he repeated this requirement when he met Egan in July and told Egan that if the front money was not received by Alcan immediately the metal for Lyntel's order would have to be obtained at a premium from a warehouse. Dungan denied using the term "black market" during this conversation or requesting immediate payment of $23,000 cash. Dungan stated the lead time in 1974 for ordering metal from mills was 16 to 20 weeks. He did not know whether Alcan could have obtained the steel to complete Lyntel's order by September 15, 1974 if the front money had been received on July 16.

Robert Buck, the regional credit manager for Alcan, corroborated the testimony of Hennigan and Dungan. He said it was clearly stated to Egan at the June 1974 meeting that front money was to be paid before the metal would be acquired by Alcan to fill Lyntel's order. On cross-examination, Buck testified that in 1973 Lyntel paid the front money in September which was after the raw materials reached Alcan's plant.

Robert Farmer, chief of the production department of Alcan in 1974, testified that he was responsible for ordering all raw materials. He stated that it was not necessary to order all raw materials in advance but that Lyntel's order for 100,000 units would have required an advance special order. Farmer stated that he had not seen Lyntel's 1974 orders and that no purchase orders were issued for the raw materials. Farmer denied that he had conversed with or met with Egan in 1974 and said that he had no conversations with Hennigan, Dungan or Buck relative to Lyntel's orders. He confirmed that a steel shortage existed in 1974 and stated that lead time to obtain steel to fill Lyntel's order for 100,000 units would have been three to six months.

At the conclusion of the trial, the court entered judgment in favor of the plaintiffs and awarded damages in the amount of $100,000. The trial court declined to make findings of fact and conclusions of law.

On appeal Alcan initially contends that judgment was entered in the plaintiffs' favor based on a theory of liability that was not presented in

their complaint or supported by the evidence at trial.[3] The defendant argues that the plaintiffs pleaded and sought to prove at trial that the defendant had breached its contract with Lyntel. Alcan contends, however, that the trial judge erroneously ruled against it and imposed liability based on a theory similar to unfair termination of a continuing franchisee or distributor agreement.

We have reviewed the remarks of the trial court and disagree with defendant's argument. While the remarks of the trial court appear ambiguous in part, we feel that the court imposed liability upon the defendant based on a breach of contract theory. We find it particularly convincing that the trial court began its remarks at the conclusion of the trial with the statement that the elements of a contract were proved. We do not believe that the trial court based liability on a continuing relationship theory and, therefore, find it unnecessary to address defendant's argument that that theory was not supported by the manifest weight of the evidence.

Concluding that the defendant was adjudged liable based on the contract theory presented by the plaintiffs, we believe it necessary to determine whether the finding of liability was supported by the evidence. It is the plaintiffs' contention that the evidence showed that a contract existed between the parties and that, contrary to Alcan's argument, the payment of front money was not a condition precedent to the formation of that contract.

A condition precedent is one which must be performed before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform. (*In re Estate of Albrecht* (1975), 27 Ill. App. 3d 839, 327 N.E.2d 317.) A condition precedent is to be performed before the agreement becomes effective and binding on the parties and calls for the happening of some event or the performance of some act after the terms of the contract have been agreed on. (*Crawford v. Abraham Lincoln Life Insurance Co.* (1934), 278 Ill. App. 576.) If the condition remains unsatisfied, the obligations of the parties are at an end. (*Getz v. City of Harvey* (7th Cir.

---

[3] The plaintiffs argue that Alcan should not be permitted to claim this error because Alcan failed to raise it at trial or in its post-trial motions. We note, however, that Alcan could not have alleged this error at those times because the defendant was not fully aware of this alleged misapprehension until after the court's ruling on the defendant's post-trial motions. Furthermore, Alcan has not waived this error by failing to include it in its post-trial motions because in a civil bench trial the failure to include an issue in a post-trial motion does not preclude its consideration by the reviewing court. *Commercial Discount Corp. v. Bayer* (1978), 57 Ill. App. 3d 295, 372 N.E.2d 926; Ill. Rev. Stat. 1977, ch. 110A, par. 366(b)(3)(ii).

The plaintiffs also argue that the defendant should not be allowed on appeal to change the theory upon which the case was tried. We note, however, that Alcan is not changing the theory of the case; rather, Alcan is arguing that an error was committed at trial when the judge decided the case on a theory not propounded by the parties.

1941), 118 F.2d 817, *cert. denied* (1941), 314 U.S. 628, 86 L. Ed. 504, 62 S. Ct. 59.) Whether an act is necessary to the formation of the contract or to the performance of an obligation depends upon the facts of the case. See *National Dairymen Ass'n v. Dean Milk Co.* (7th Cir. 1950), 183 F.2d 349, *cert. denied* (1950), 340 U.S. 876, 95 L. Ed. 637, 71 S. Ct. 122.

■■ Applying these rules to the case at bar, we find that liability should not have been imposed upon Alcan without a determination of whether the payment of front money by the plaintiffs to Alcan was a condition precedent to the formation of their contract. As it is not clear from the record that this issue was in fact decided by the trial court, this case should be remanded for the purpose of resolving this issue. (See *Nasco, Inc. v. Dahltron Corp.* (1979), 74 Ill. App. 3d 302, 392 N.E.2d 1110; *Casati v. Aero Marine Management Co.* (1976), 43 Ill. App. 3d 1, 356 N.E.2d 826.) If on remand the court finds that the payment of front money was a condition precedent which was never fulfilled, judgment should be rendered in the defendant's favor.

The defendant next argues on appeal that the trial court erred in denying its post-trial motion to modify the judgment. The defendant's post-trial motion argued that the plaintiffs were required to mitigate their damages by seeking financing in July of 1974 to meet the front money requirements of Alcan rather than to seek another source of metal pans.

Section 2—715(2) of the Uniform Commercial Code provides that consequential damages resulting from the seller's breach include:

> "(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise;" (Ill. Rev. Stat. 1977, ch. 26, par. 2—715(2)(a).)

The defendant relies on this provision and cites cases that state the buyer is obligated to minimize his loss and pay cash when the seller demands cash after the seller had agreed to extend credit. (See, *e.g., Lawrence v. Porter* (6th Cir. 1894), 63 F. 62.) The buyer can recover damages thereafter amounting to interest for the period during which credit was to have been extended. (See, *e.g., Warren v. Stoddart* (1881), 105 U.S. 224, 26 L. Ed. 1117.) The defendant in the instant case suggests that a similar requirement should have been imposed upon the plaintiffs in July 1974 when Dungan demanded a cash payment. The defendant relies on testimony by Egan that he had financing available to him up to an amount of $10,000 and argues, therefore, that Egan should have made the cash payment to Alcan instead of seeking an alternative manufacturer.

■■ The defendant's argument ignores other testimony of the witnesses, to wit, Dungan's statement that he could not answer whether Alcan could have filled Lyntel's order had Egan paid the front money of July 16, 1974. We also note that Dungan testified that due to the steel shortage in 1974,

the necessary lead time to order raw materials was 16 to 20 weeks. Farmer, a defense witness, also testified that the lead time for ordering raw materials was three to six months. Furthermore, Egan testified that in July of 1974 Dungan demanded $23,000 so that steel could be acquired on the black market.[4] Thus, on the basis of this accumulated testimony, we believe there was insufficient evidence to support defendant's argument that it could have filled plaintiffs' order by the delivery date of September 15, 1974, even if Egan had obtained financing and paid the front money in July.

A buyer effects cover, under the Uniform Commercial Code, by "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." (Ill. Rev. Stat. 1977, ch. 26, par. 2—712(1).) We believe the plaintiffs satisfied the requirement of cover by purchasing goods in substitution for those due from the defendant. The plaintiffs proceeded without delay to find an alternate source in July immediately after his conversation with Dungan and upon the realization that Alcan would not fill Lyntel's order by the required date. The plaintiffs' substitute purchase was reasonable under the facts presented.

Thus, we believe the plaintiffs mitigated their damages and, if the court finds in their favor on remand, they are entitled to the consequential damages proved.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded for further proceedings consistent with the holdings of this opinion.

Reversed and remanded.

RIZZI, P. J., and McNAMARA, J., concur.

---

[4] Dungan denied that he had used the term "black market" and could not recall telling Egan that he would have to pay $23,000 to Alcan so that steel could be obtained.