TODD B. McKEE *et al.*, Plaintiffs-Appellees, v. THE FIRST NATIONAL
BANK OF BRIGHTON, Defendant-Appellant.

Fourth District   No. 4—90—0788

Opinion filed October 17, 1991.

Ronald C. Mottaz, of Thomas, Mottaz, Eastman & Sherwood, of Alton, for appellant.

John M. Delaney, Jr., and Steven Selby, both of Allen, Mendenhall, Delaney & Associates, of Alton, for appellees.

PRESIDING JUSTICE LUND delivered the opinion of the court:

Following a bench trial, the circuit court of Macoupin County awarded damages to plaintiffs Todd and Suzanne McKee in the amount of $216,375 for the breach of a loan commitment by defendant the First National Bank of Brighton. Of this amount, $196,000 was awarded for plaintiffs' loss of profits. The balance of the judgment was for reimbursement to plaintiffs for various out-of-pocket expenses. Defendant now appeals from this judgment, claiming (1) there was no contract; or (2) if there was a contract, there was no breach of the loan commitment by the defendant; and (3) if there was a breach, the trial court erred in awarding any lost profits to plaintiffs. We reverse.

In September 1986, plaintiffs applied to defendant for a construction loan to build a gasoline service station-convenience store, to be known as PDQ Mart (PDQ). The land on which the improvements were to be constructed had been purchased for this purpose by Fassero Oil Company (FOC), plaintiffs' partner in the project. FOC had taken record title to one of the lots, and had purchased the other lot through an assignment of a contract that had a favorable interest rate. Plaintiffs were to own and operate the improvements, and FOC was to lease the land to plaintiffs for a 20-year period. FOC would own the underground gasoline storage tanks and other equipment and supply gasoline to plaintiffs. FOC and plaintiffs were to split profits on sales of self-service gasoline.

Plaintiffs, together with John and Ben Fassero, principals of FOC, met with officials of defendant in early September 1986 to discuss the project and the terms of a proposed loan. These negotiations led to a written offer from defendant to make a loan to plaintiffs in the amount of $340,000. This loan was to be made only to plaintiffs, not FOC. The loan commitment was made subject to the following conditions: plaintiffs were to grant defendant a security interest in the building, equipment and inventory, assign their lease with FOC to defendant, grant defendant a second mortgage on their personal residence, and obtain life insurance on themselves and assign it to defendant. A further condition was that FOC take record title to all

the land in its own name and subordinate its interest in the land to defendant's loan, a condition to which FOC had agreed in principle at the prior meeting. The letter did not specify how the subordination would be accomplished.

Although plaintiffs did not accept the loan commitment offer in writing, they verbally informed defendant's officials that the loan commitment was acceptable to them. Further, they requested, and received, a letter from defendant to give to their architect confirming the loan commitment. Plaintiffs also began immediately to fulfill some of the loan conditions. By late September 1986, plaintiffs had purchased the required life insurance and assigned it to defendant. Within approximately two months of the date of the loan commitment, most of the conditions in the commitment letter had either been complied with or were expected to be met. Loan conditions were still being met by plaintiffs and FOC as late as December 1986, when an amendment to plaintiffs' lease with FOC was signed, assigning the lease to defendant in the event of plaintiffs' default on the proposed loan.

Plaintiffs commenced construction on the project shortly after approval of the loan. Defendant became concerned about plaintiffs beginning construction without all loan conditions having been met. One of defendant's officials hand-delivered a letter to plaintiffs on October 9, 1986, advising plaintiffs that they were proceeding at their own risk in continuing with construction before all conditions had been met. The letter cautioned plaintiffs that defendant's approval of the loan was conditional and not an absolute commitment of funds. The letter further stated that no loan could be made to plaintiffs until all conditions of the loan commitment letter had been met, defendant had adequate security, and proper documents had been executed by all parties and recorded. Despite this warning, plaintiffs continued with construction, evidently believing that all loan conditions would eventually be met.

FOC was represented by an attorney, Richard Meno (Meno), in regard to the subordination matter. Defendant retained Robert Watson (Watson) as legal counsel to assist in the accomplishment of the subordination. All negotiations were handled between the two attorneys.

Meno submitted a proposed subordination agreement to Watson, by which FOC would subordinate its interest in the land to defendant's loan. In the event of plaintiffs' default on the loan, FOC was given the right to take over the loan. If FOC chose not to exercise this right, the agreement obligated FOC to execute "a good and sufficient Warranty Deed" of the real estate to defendant. After sale of

the real estate, the agreement provided for FOC to receive any proceeds of sale remaining after satisfaction of defendant's loan and expenses. About the same time, Meno also submitted to Watson some proposed language for inclusion in plaintiffs' note and mortgage, by which FOC would be relieved of any personal liability for repayment of plaintiffs' loan, thus recognizing the possibility of accomplishing the subordination by FOC joining in the note and mortgage. It was clear from testimony at the trial, however, that FOC preferred to accomplish the subordination by means of the proposed subordination agreement. Despite the condition in the loan commitment letter requiring FOC to take record title to the land, FOC still hoped to retain its favorable contract on one of the lots.

Watson submitted this proposed agreement to Attorneys' Title Guaranty Fund, Inc. (Attorneys' Title), for an opinion on the sufficiency of the agreement and on the insurability of defendant's proposed mortgage with plaintiffs. The reply he received from corporate counsel for Attorneys' Title stated that defendant's mortgage on the premises could be insured only if FOC, as owner of the fee, joined in the execution of the mortgage. Watson relayed this information to Meno and indicated he preferred to accomplish the subordination by FOC signing plaintiffs' note and mortgage. Watson prepared the note and mortgage for signature by plaintiffs and FOC. Both the note and mortgage contained exculpatory language as to FOC, relieving it of any liability for repayment of the note or for any deficiency upon foreclosure of the mortgage. Both documents also gave FOC the right to take over plaintiffs' payments on the note and mortgage in the event of their default.

FOC refused to sign the note and mortgage. Testimony at trial indicated that some of FOC's stockholders were concerned about FOC being committed to plaintiffs' loan and the possible limitation on FOC's future ability to borrow as long as plaintiffs' loan with defendant was outstanding.

Plaintiffs were notified on January 15, 1987, by John Fassero that FOC would not cosign the note and mortgage. At that time, PDQ was only a few weeks away from completion, because plaintiffs had continued with construction despite receiving no disbursement of funds on the loan by defendant.

Evidence at trial was conflicting concerning what plaintiffs knew about events taking place regarding the subordination issue. Defendant's officials testified they had advised plaintiffs from time to time that there were some problems with the paperwork. Apparently, no one specifically told plaintiffs the deal might fall through because of

the lack of acceptable subordination by FOC. In fact, it is not clear from the record just when defendant was notified about FOC's refusal to sign the note and mortgage. It would appear the first indication defendant had about FOC's refusal may have come from plaintiffs themselves in January 1987, after they were told by John Fassero of FOC's decision.

After learning of FOC's refusal to meet the subordination condition in the manner required by defendant, plaintiffs made no demand upon defendant to make the loan to them. In fact, it appears plaintiffs and officials of defendant simply let the matter drop. One of defendant's officials testified that as far as he was concerned, the loan was still open. However, it is clear defendant was not willing to disburse any funds to plaintiffs under its commitment, unless FOC agreed to subordinate its interest in the land in the manner required by defendant.

After the loan from defendant fell through, FOC paid for construction of PDQ and took over its operation. Plaintiffs entered into negotiations with FOC, attempting to salvage something from the PDQ project. They entered into an oral lease, by which plaintiffs operated the service station portion of PDQ for approximately six months. After that, plaintiffs entered into a lease to operate the Brighton Amoco station across the street from PDQ. Plaintiffs were operating this business at the time of trial in this cause. Plaintiffs then filed suit, seeking damages for the alleged breach of the loan commitment by defendant.

On appeal, we need address only the questions of whether a contract existed and, if so, whether defendant breached that contract.

Defendant argues there was no contract because of the failure of plaintiffs to "accept" the key subordination condition; that because plaintiffs did not perform this condition, there was no acceptance of defendant's offer. We disagree.

■ The evidence shows a contract between the parties did in fact exist. A contract requires an offer, an acceptance, and consideration. (*La Salle National Bank v. Vega* (1988), 167 Ill. App. 3d 154, 520 N.E.2d 1129.) An offer was made by defendant in its September 17, 1986, loan commitment letter. That letter did not require any particular mode of acceptance by plaintiffs. It simply stated: "Upon acceptance of the above terms and conditions[,] The First National Bank of Brighton will proceed as quickly as possible to complete the transaction." While it was undisputed that plaintiffs did not accept the offer in writing, the testimony at trial indicated plaintiffs had verbally advised defendant's officials of their acceptance. They requested, and re-

ceived, a letter from defendant confirming the loan commitment to give to their architect. These manifestations of assent to the offer by plaintiffs were sufficient to constitute acceptance of the offer. Testimony at trial indicated that in prior loan transactions between the parties, defendant had prepared all necessary paperwork for plaintiffs to sign. In light of this past relationship, the only reasonable interpretation of the above-quoted sentence from defendant's offer is that once plaintiffs notified defendant the conditions were satisfactory, defendant would begin the process of completing the paperwork necessary to the payout of the loan proceeds. Thus, defendant's offer did not contemplate that the offer of a loan commitment could be accepted only upon completion of all conditions; that is not to say, however, that the payout of the loan proceeds was not subject to the performance of the enumerated conditions.

An offeree may also accept an offer by performance of an act required by the offer. (*Weather-Gard Industries, Inc. v. Fairfield Savings & Loan Association* (1969), 110 Ill. App. 2d 13, 248 N.E.2d 794.) Here, plaintiffs not only verbally accepted the loan commitment offer, they almost immediately commenced performance of the conditions which it was possible for them to perform, as is evidenced by their fulfillment of the life insurance requirement.

There was adequate consideration to support the contract in this case. "[A]ny act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract." (*Libertyville Township v. Woodbury* (1984), 121 Ill. App. 3d 587, 592, 460 N.E.2d 66, 71.) Here, defendant promised to loan a considerable amount of money to plaintiffs if the specified conditions were met. Plaintiffs agreed to perform those conditions and did, in fact, perform several of them.

This brings us to the second of defendant's arguments—that, if a contract existed, there was no breach of it by defendant because not all conditions of the loan had been met by plaintiffs and FOC.

Findings of fact made by the trial court will not be disturbed on review unless they are contrary to the manifest weight of the evidence. (*Village of Wilsonville v. SCA Services, Inc.* (1981), 86 Ill. 2d 1, 15, 426 N.E.2d 824, 831; *John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 218, 367 N.E.2d 695, 698.) However, we must set aside the findings of the trial court in this case for reasons set forth below.

Defendant's September 17, 1986, commitment letter contained several conditions which had to be met by plaintiffs to secure the loan from defendant. The only condition with which there was any diffi-

culty was the requirement that FOC subordinate its interest in the land to defendant's loan. The trial court was of the opinion that the subordination agreement proposed by FOC would have been sufficient to accomplish the subordination of FOC's interest in the land to the lien of defendant's mortgage with plaintiffs. The court believed that defendant's requirement that FOC cosign plaintiffs' note and mortgage as the only satisfactory method of subordination was without merit. The court found that by refusing to accept FOC's proffered subordination agreement, defendant breached the contract to make the loan to plaintiffs. In making these findings, the trial court implicitly found that defendant had acted unreasonably in requiring FOC to execute the note and mortgage. We disagree with this reasoning.

Defendant relied upon its legal counsel in deciding what form the subordination should take. Defendant's attorney submitted FOC's proposed agreement to Attorneys' Title for an opinion as to the sufficiency of the agreement and the insurability of defendant's mortgage. The answer he received was clear and unequivocal—FOC must join in the mortgage in order to provide defendant with adequate security. The mortgage would not be insurable without the owner of the real estate joining in the execution of it. It was only after receiving this communication from Attorneys' Title that defendant's attorney told FOC's attorney that FOC would have to sign the note and mortgage.

The attorneys for defendant and FOC both testified at trial. Both men agreed that subordination of FOC's interest in the land could be accomplished through a separate agreement, or through FOC joining in the note and mortgage with appropriate exculpatory language. Watson testified that execution of plaintiffs' note and mortgage by FOC would have provided defendant with a lien on the property of a more secure nature. He further testified that the proposed subordination agreement had not been prepared with the apparent intention of recording it. Therefore, it would not be notice to third parties that FOC had any obligation to subordinate its interest in the land to defendant's loan with plaintiffs. He also testified that nothing in the agreement would have prevented FOC from removing its improvements from the land, thus impairing defendant's security. In the event of a default by plaintiffs on their loan and, if FOC did not willingly comply with its agreement to convey the land to defendant, it would have been necessary for defendant to file two lawsuits in order to realize on its security—one against plaintiffs and the other against FOC asking for specific performance of the subordination agreement. Defendant's counsel testified these potential problems would be eliminated by FOC joining in the note and mortgage.

FOC's counsel also testified along the same lines. He said the proposed subordination agreement would have been fine for FOC's purposes, but he admitted defendant would have a difficult time realizing on its security with only the protection of the subordination agreement. One of the reasons he had originally drafted this agreement was that FOC wanted to keep its favorable contract for deed on part of the land, despite the explicit condition of the loan commitment that FOC acquire record title to all the land.

■ Every contract implies a duty of good faith and fair dealing between the parties. (*Carrico v. Delp* (1986), 141 Ill. App. 3d 684, 490 N.E.2d 972; *Honkomp v. Dixon* (1981), 97 Ill. App. 3d 476, 422 N.E.2d 949.) Implicit in the trial court's decision on this issue is the finding that defendant breached this duty to plaintiffs by insisting that FOC execute the note and mortgage as the only acceptable manner of subordination. Such a finding is not supported by the evidence. Both Watson and Meno testified that the purpose of the subordination would dictate how it should be accomplished. Here, the obvious purpose of FOC's subordination was to provide the maximum security possible for what was to be a very substantial loan from defendant to plaintiffs. From FOC's standpoint, the purpose would have been to induce the defendant to make the loan to plaintiffs but, at the same time, to protect FOC from any liability for repayment of the loan. All the testimony at trial indicated that the proposed exculpatory language placed in the note and mortgage would have accomplished everyone's goals. Indeed, the language used was provided by FOC's own attorney. Under the circumstances, defendant's requirements of FOC with regard to the subordination were entirely reasonable, and they did not cause a breach of the contract with plaintiffs.

■ Along with the other loan conditions, the condition requiring FOC to subordinate its interest in the land to defendant's loan was a condition precedent to defendant's duty to perform its obligations under the contract. A condition precedent is one which must be performed before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform. (*Lyntel Products, Inc. v. Alcan Aluminum Corp.* (1981), 107 Ill. App. 3d 176, 437 N.E.2d 653.) If the condition remains unsatisfied, the obligations of the parties are at an end. Whether an act is necessary to the formation of the contract or to the performance of an obligation depends upon the facts of the case. (*Lyntel*, 107 Ill. App. 3d at 181, 437 N.E.2d at 657.) The language "subject to" generally indicates a party's promise is not to be per-

984

formed unless a condition occurs. *In re Estate of Bajonski* (1984), 129 Ill. App. 3d 361, 472 N.E.2d 809.

■ Under the facts in the instant case, as indicated above, the loan conditions were clearly intended to be performed prior to defendant's obligation to make the loan, rather than prior to the formation of the contract. Although it is true that the performance of the key subordination condition was not within plaintiffs' control, it was the responsibility of FOC as plaintiffs' partner in the PDQ project. The failure of FOC to perform this condition to defendant's satisfaction meant that defendant did not have the duty to make the loan to plaintiffs. Its obligation to perform under the contract therefore did not arise and there was no breach when the loan was not made.

The judgment of the trial court is therefore reversed.

Reversed.

STEIGMANN and McCULLOUGH, JJ., concur.