**CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Plaintiff,**

v.

**ATLAS MINERALS, INC. and Indiana Coal Company f/k/a Buck Creek Mining, Inc., Defendants.**

No. 95–3328.

United States District Court, C.D. Illinois, Springfield Division.

May 27, 1997.

Stephen A. Tagge, Thomas H. Wilson, Stephen R. Kaufmann, Springfield, IL, for plaintiff.

Craig A. Randle, James R. Potter, Springfield, IL, Charles A. Wagner, III, Knoxville, TN, for defendants.

## *OPINION*

RICHARD MILLS, District Judge:

A contract between a coal company and a public utility to supply coal.

During the term of the contract, things did not go well for the coal company.

Now that the term of the contract has expired, the parties disagree whether each side held up its end of the bargain.

To resolve this case, the Court must untangle the parties' extensive dealings and must unravel and apply two provisions of the Uniform Commercial Code.

## I. BACKGROUND

### A. *Parties and Characters*

Defendants Atlas Minerals, Inc. (Atlas) and Indiana Coal Company (Indiana Coal) are both Indiana Corporations. Indiana Coal is the successor to two merged companies, Buck Creek Coal, Incorporated and Buck Creek Mining, Incorporated. Atlas was the marketing representative for the Buck Creek companies (for simplicity's sake, the Court will call Defendants collectively: Atlas).

Atlas Minerals, Inc. was wholly owned by Walter Pieper. Pieper was also a principal in Buck Creek. From 1986 to 1994, Richard Bartholomew acted as the Vice President of Marketing for Atlas. Charles Schulties became an investor in Buck Creek in 1992, and assumed an active management role in mid–1994 when Pieper became ill.

Central Illinois Public Service Company (CIPS) is an Illinois public utility supplying electricity to central and southern Illinois. CIPS operates several coal-burning power plants in Illinois. CIPS buys coal to burn in its power plants by entering long-term purchase contracts (like the one at issue in this case) and by making "spot" purchases (open market purchases with durations of less than one year).

In 1988–89, CIPS' Fuel Procurement Section handled the utility's purchases of coal. Mark Cochran, an engineer and attorney, headed the Fuel Procurement Section. The Fuel Procurement Section fell within CIPS' Purchasing and Stores Department, headed by James Birkett. John Prier and Bruce Garner worked for Cochran in the Fuel Procurement Section. In 1990, Dennis Kirchner took over Cochran's post when Cochran was promoted.

### B. *The Contract*

On June 22, 1989, Atlas and Indiana Coal entered into a Coal Sale and Purchase Agreement (the contract) with CIPS. Through the contract, Atlas agreed to sell coal from the Buck Creek mine near Sullivan, Indiana to CIPS to burn at its Newton, Illinois Generating Station Unit Number 2. Due to a geologic anomaly, the Buck Creek mine produces both high and low sulphur coal. The contract was for the purchase of "compliance coal," coal that produces less than 1.2 pounds of sulphur dioxide per 1,000 BTUs of energy released when the coal is burned. At the Buck Creek mine, compliance coal came from the north section and high sulphur coal from the south section of the mine.

The parties' sixteen page contract specifies delivery schedules and prices for the coal, and describes in detail the properties of the coal to be supplied. It also specifies its term: "This Agreement shall commence on June 22, 1989, and continue through December 12, 1995. No suspension of an obligation under this Agreement by reason of Force Majeure (as hereinafter defined) shall extend the term of this Agreement, except upon mutual consent of the SELLER and BUYER." The parties agreed that Illinois law would govern the contract. For purposes of this litigation one of the most important contract provisions is this: "This Agreement contains the entire agreement between the parties hereto, and no alteration or modification thereof shall be binding unless in writing and signed by the BUYER and SELLER."

The contract specified that from June 1, 1990 to December 31, 1990 Atlas would sell and tender a minimum of 100,000 tons of coal, less any tonnage excused by reason of a force majeure. From January 1, 1991 to December 31, 1995, Defendants were required to sell at least 235,000 tons per year and not more than 250,000 tons per year (the contract allowed CIPS to elect to receive any quantity between 235,000 and 250,000 tons per year). The contract set prices for the coal that started at $22.27 per ton for the first 50,000 tons of coal delivered during the June 1, 1990 to December 31, 1990 period. The final price, for the January 1, 1995 through December 31, 1995 period was either $27.37/ton or $27.85/ton depending on the method of shipment. At the time the parties entered the contract, the prices were below the market price for purchases of coal on the "spot" market. The contract did not contemplate delivery of any coal beyond the specified annual allocations, unless the parties amended the contract.

The contract defined the term "force majeure" as:

[A]ny causes beyond the reasonable control of the party affected thereby, such as acts of God; acts of the public enemy; insurrections; riots; strikes; labor disputes; fires; explosions; floods; breakdown or damage to plants, equipment, or facilities; accidents of navigation; inter-ruptions to transportation; river freeze-ups; embargoes; orders or acts of military or civil authority (executive, judicial, or legislative), including but not limited to, any regulation, direction, order, or request (whether valid or invalid) made by any governmental authority or person acting therefor, which is complied with in good faith; or other such causes of a similar or dissimilar nature which wholly or partly prevent the mining, delivering, and/or loading of coal by SELLER, or the receiving, transporting and/or delivering of coal by the carrier of the coal, or the accepting, utilizing and/or unloading of the coal by BUYER. The doctrine of ejusdem generis shall not be applied to exclude any event dissimilar to the enumerated events, but which is beyond the reasonable control of a party.

The effect of a force majeure under the contract was to allow the party suffering the force majeure to cease performance upon notice to the other party. Thus, if one party suffered a force majeure event and gave notice to the other party, the notifying party was excused from performing its obligations under the contract from the beginning of the force majeure until the condition ceased. The contract specified, however, that "[a]ny deficiencies in deliveries of coals hereunder, which are excused by Force Majeure, shall not be made up except by mutual consent of the parties."

## C. *The Course of Performance*

The relationship between CIPS and Atlas was troubled, primarily because the Buck Creek mine did not live up to expectations. The mine's disappointing performance has led to bankruptcy for Indiana Coal and, predictably, to this lawsuit.

Problems began early and continued through the life of the contract. In 1990, Buck Creek experienced severe mining difficulties and wrote to CIPS to claim a force majeure. In a November 30, 1990 letter to CIPS, Rick Bartholomew stated that Indiana Coal had encountered mining difficulties and wished to excuse a production shortfall of 69,629 tons.

On December 4, 1990, representatives of CIPS, Atlas, and Indiana Coal met to discuss the 1990 shortfall. On December 21, 1990, Dennis Kirchner of CIPS wrote back to Indiana Coal:

> ... At this time, [CIPS] does not believe it is appropriate to Force Majeure this tonnage. Our Agreement guarantees CIPS 100,000 tons of coal (less applicable Force Majeure) in 1990 and 250,000 annual tons of coal (less applicable Force Majeure) for the period of January 1, 1991 through December 31, 1995. Accordingly, CIPS would like to further discuss this issue with Atlas [ ] and Buck Creek [ ].
>
> Because of the poor mining conditions experienced by Atlas during the start-up and your discussions regarding the effect it has had on cash flow of the mine, CIPS would be willing to discuss 1) the delivery of the subject tonnage at such time when production levels of compliance coal have stabilized (including delivery after December 31, 1995); and 2) a price or pricing mechanism for the subject coal that is agreeable to both parties.

Representatives of the parties again met on January 25, 1991. At the meeting, Atlas proposed making up the 1990 shortfall in two installments of 15,000 tons each in 1994 and 1995 followed by a third installment of 39,629 in 1996. On February 7, 1991, John Prief wrote to Rick Bartholomew of Atlas and stated:

> During our meeting of January 25, 1991, in Springfield, Illinois, you proposed the following possibilities for making up the shortfall of the 1990 shipments (69,629 tons):
>
> For each of the years 1994 and 1995, deliveries would be accelerated by approximately 15,000 tons. CIPS would pay the applicable price for each year, as stated in our Agreement.
>
> 2) For the year 1996, deliveries would be accelerated by approximately 39,-629 tons. CIPS would pay the 1995 price, plus any escalation that would be based on an indicator agreed to by both parties.
>
> As stated in our letter of December 21, 1990, CIPS is agreeable to making up the

tonnage at an agreed-to price that differs from the contract price. We would, however, prefer to have the tonnage made up as soon as production levels permit. This would afford both parties the possibility of making up tonnage in any future adverse mining conditions.

On February 18, 1991, Rick Bartholomew responded to Prief's letter:

> In response to your letter of February 7, 1991, I have listed below for your review our thoughts regarding the 1990 shortfall tonnage—69,629 tons.
>
> (1) 1994—15,000 tons delivered in addition to the 1994 base contract tonnage. This tonnage would be priced at the 1994 contract price.
>
> (2) 1995—15,000 tons delivered in addition to the 1995 base contract tonnage. This tonnage would be priced at the 1995 contract price.
>
> (3) 1996—39,629 tons delivered in addition to the contract tonnage elected by [CIPS]—1996. The 1996 shortfall tonnage would be priced at the 1995 contract price, adjusted (+) by an escalator of 6%. The base contract tonnage for 1996 would follow the pricing guidelines of our agreement.
>
> (4) Tonnage considered as surplus to (1) our operations and (2) our required base contract tonnage, during 1991, 1992, and 1993, will be shipped to satisfy our shortfall tonnage requirement. This coal will be delivered following negotiation of, and approval by [CIPS]. Pricing would be governed by the contract price in effect at the time of delivery.
>
> John, if the above conditions are satisfactory to [CIPS], we are prepared to execute a Memorandum or Letter of Agreement, following these guidelines.

In a February 22, 1991 telephone call, CIPS indicated to Bartholomew that Atlas could ship its excess production to make up the 1990 shortfall. Then, on March 6, 1991, J.L. Lisenbee, CIPS' Vice President for Cor-

porate Services[1], responded to Bartholomew's February 18, 1991 letter. He wrote:

> After reviewing your letter of February 18, 1991, regarding the 1990 delivery shortfall of 69,629 tons, [CIPS] would like to propose the following:
>
> 1. During each of the contract years 1994 and 1995, CIPS shall receive, in addition to the contractual tonnage stated in Article III, 15,000 tons at the applicable price for each year as stated in Article X;
>
> 2. During 1996, CIPS shall have the option to receive 39,629 tons. The price for this tonnage shall be determined by a mutually agreed to method of adjusting the 1995 contract price as stated in Article X of the subject Agreement;
>
> 3. In the event surplus tonnage of the quality specified in the Agreement is mined prior to 1994, CIPS shall have the right of first refusal to such tonnage. The price per ton shall be at the price stated in Article X for the year in which it was delivered; and
>
> 4. The terms and conditions of this Letter Agreement shall not be considered precedential.
>
> If your are in agreement with the above stated, please have the appropriate person sign below and return one executed original of the letter to my attention.

Atlas never executed the proposed agreement.

Also on March 6, 1991, CIPS declared a force majeure with respect to 3,972 tons of coal due to a condenser leak at the Newton power plant. The parties met in March 1991 to discuss CIPS' force majeure claim. In a memorandum of the meeting, Bartholomew indicates that he told CIPS' representatives that he thought their force majeure claim was trivial and made Atlas reconsider its position regarding the 69,629 tons it had proposed to force majeure. The memorandum also indicates that Atlas considered the possibility of selling excess coal produced in 1991 on the open market instead of using it to make up the 1990 shortfall on the CIPS contract. On March 21, 1991, Bartholomew wrote to Walter Pieper to suggest a written response to CIPS' March 6, 1991 proposal. The proposed response was actually sent to CIPS. It stated:

> In reference to the proposed letter of agreement dated March 6, 1991 and executed by Mr. J.L. Lisenbee, regarding the 1990 shortfall/force majeure [sic] tonnage, Atlas Minerals–Buckcreek would like to propose the following. The format suggested follows that indicated in my letter to you dated February 18, 1991, and deviates slightly from the method suggested in Mr. Lisenbee's letter.
>
> (1) During each of the contract years 1994 and 1995, CIPS shall receive, in addition to the contractual tonnage stated in Article III, 15000[sic] tons at the applicable price for each year as stated in Article X;
>
> (2) During 1996, CIPS shall have the option to receive 39,629 tons. The price for this tonnage shall be determined by a mutually agreed to method of adjusting the 1995 contract price as stated in Article X of the subject agreement;
>
> (3) Any tonnage considered as surplus to (1) Atlas–Buckcreek operations and (b) our required base contract tonnage, during 1991, 1992, 1993 can be shipped *at the sole discretion* of Atlas–Buckcreek to satisfy our 1990 shortfall/force majeure [sic] tonnage. Pricing would be governed by the applicable contract price in effect at the time of shipments.
>
> Acknowledging all of our previous correspondence and discussion regarding this tonnage, we propose the format indicated above, to resolve this issue. Please consider that we have not altered our position regarding the legitimacy of our original force majeure [sic] claim, however, we wish to resolve the problem in a manner satisfactory to CIPS.

. . . . .

---

1. Lisenbee was the CIPS corporate official authorized to enter into a written amendment of the contract.

John, if Sections I, II and II above represent a satisfactory method of addressing our 1990 force majeure/shortfall [sic] tonnage, please incorporate the language in a letter of agreement, and we will execute the letter to resolve this issue.

These letters did not culminate in a written agreement to dispose of the Force Majeure claims or to make up the 1990 delivery shortfall.

By the end of 1991, Atlas had delivered 274,304 tons of coal. CIPS paid for the first 69,629 tons at the 1990 contract price. CIPS paid the 1991 price for the remaining 204,675 tons, leaving a shortfall for 1991 of 45,325 tons. On October 1, 1991, CIPS informed Atlas in writing that it wished to receive 250,000 tons of coal in 1992. In a December 12, 1991 meeting, the parties discussed shipment schedules for 1992. The parties concurred that any coal delivered in 1991 above the 250,000 tons required by the contract would be applied to the 1990 shortfall.

In January 1992, Atlas sought additional financing for its operations from Old National Bank of Evansville, Indiana. In its loan proposal, Atlas repeatedly indicated that its contract with CIPS expired in 1995. Atlas stated "[t]he bulk of the low sulfur coal is sold under contract with [CIPS] and Pfizer through 1995." Atlas also listed its current contracts and their termination dates. The CIPS contract was listed as expiring on December 31, 1995, "with CIPS having the option to extend for a three-year period...."

In early 1992 Atlas must have been optimistic about the coming year, because on March 19, 1992, Bartholomew wrote CIPS and proposed a delivery schedule for the remainder of 1992 that would not only make up all existing deficits, but would also leave a 41,000 ton surplus at year's end. On his file copy of the letter, Bartholomew wrote a note to Pieper in which he expressed doubt that CIPS would agree to accept 41,000 tons of surplus coal in 1992. Bartholomew indicated that if CIPS refused, Atlas would insist on selling that surplus to another buyer and crediting it against its obligation to CIPS.

CIPS initiated the only written amendment to the contract when, on September 4, 1992, it wrote to Atlas to complain about the coal's moisture content and Gross Calorific Value. The parties resolved CIPS' complaints in a written amendment signed by J.L. Lisenbee and Bartholomew. The amendment provided that "[e]xcept as hereby amended, the Agreement and each and every provision and condition thereof, is and shall remain in full force and effect."

On September 29, 1992, CIPS informed Atlas that it wished to receive 250,000 tons of coal during 1993. During the negotiations about coal quality, Bartholomew wrote CIPS a letter regarding coal shipments for the remainder of 1992. He stated that Atlas had encountered mining problems and anticipated ending 1992 with a "carry-over of 1992 'tonnage due'. Per our discussion, we will deliver any 1992 carry-over tonnage at 1992 contract pricing." On October 28, 1992, Bartholomew wrote CIPS with a proposed delivery schedule for 1993. He estimated that Atlas would deliver between 280,000 to 290,000 tons of coal and said that Atlas would like to ship any excess coal to make up contract deficits.

The parties again met to discuss 1993 shipments on November 9, 1992. At the meeting, CIPS indicated that it wanted to receive 300,000 tons of coal during 1993. In a follow-up letter, CIPS stated:

With respect to 1990 through 1992 shipments from the Buck Creek Mine to CIPS, it is projected that the cumulative shortfall will equal approximately 134,000 tons (see attached information). It is CIPS' position that this initial 134,000 tons, or whatever the cumulative shortfall might be as of December 31, 1992, shipped during 1993, will be billed at the 1992 price.... All remaining tonnage shipped during 1993, up to 250,000 tons, will be billed at the 1993 price....

Atlas delivered 167,387 tons of coal in 1992. CIPS paid for the first 45,325 tons at the 1991 price, and the remaining 122,062 tons at the 1992 price.

1993 was not a good year for Atlas. In April, the United Mine Workers of America, who had just been chosen to represent miners at the Buck Creek mine, began a strike. During all of 1993, Atlas only delivered 83,-

605 tons of coal, all of which CIPS bought at the 1992 price.

1994 was little better. That year, Atlas shipped 129,756 tons of coal. CIPS paid for the first 44,333 tons at the 1992 price, and the balance (85,423 tons) at the 1993 price. In December 1994, Atlas lost its other major contract for coal. Atlas had previously supplied high sulfur coal from the south section of its mine to Hoosier Energy's Merom generating plant. The contract expired in December 1994, and was not renewed. Upon receiving the bad news, Atlas shut down its entire mine.

The loss of the Merom contract and the subsequent shutdown of the mine triggered a series of events in late 1994 and early 1995. First, Atlas' bank exercised its right under security agreements with Atlas to direct CIPS to forward all payments directly to the bank. When CIPS learned of this development, it sent Atlas two letters on January 13, 1995. The first letter was a notice that CIPS was terminating the contract effective July 13, 1995. The termination was pursuant to a provision in the contract that allowed either party to terminate the agreement if the other failed to deliver or purchase 50% of the tonnage required during a six month period. The second letter demanded adequate assurances of performance pursuant to § 2–609 of the Illinois Commercial Code.

The parties met on January 16, 1995. Charles Schulties (who had stepped in as the manager of the mine) indicated that Old National Bank had been on the verge of providing additional financing, but had backed down when it learned of CIPS' position. In order to obtain financing necessary to reopen the Buck Creek mine, Atlas requested "assurances relative to the marketing of [its] coal" from CIPS. Atlas stated that financing was contingent on such assurances. In a letter sent on January 17, 1995, Schulties proposed to resume deliveries in February 1995 and continue them at a rate of 15,000 to 20,000 per month until December 1995 and then at a rate of 19,000 to 30,000 per month in 1996. On January 27, 1995 CIPS faxed a letter to Atlas at 11:06 a.m. The letter stated that CIPS would accept deliveries during 1995 on a probationary basis, but would not accept any coal past the December 31, 1995 termination date in the contract. The letter also spelled out various other terms and conditions for CIPS to continue buying coal from Atlas. One hour and fifteen minutes after CIPS faxed the letter to Atlas, Bartholomew left a voice mail message for Kirchner. The message stated that Atlas would resume shipments to Newton the following Monday morning.

Atlas resumed shipments to Newton on January 30, 1995. Then, in July 1995, Atlas approached CIPS about the possibility of continuing to contract past December 31, 1995. CIPS refused to do so. In a meeting on October 2, 1995, Schulties told CIPS that he believed that Atlas was entitled to ship all of the coal contracted for under the contract, even it that meant CIPS would have to accept delivery in 1996 and beyond. CIPS disputed that claim. Atlas delivered 250,048 tons of coal in 1995. CIPS paid the 1993 price for the first 164,577 tons and the 1994 price for the remaining 85,471 tons.

### D. The Proceedings Before this Court

CIPS filed its Complaint for Declaratory Judgment on December 1, 1995. In its Complaint for Declaratory Judgment, CIPS sought a declaration that: (1) the contract between CIPS and Atlas terminated on December 31, 1995; (2) CIPS has no further obligations under that contract after December 31, 1995; and (3) CIPS complied with its obligations under the contract. Defendants answered on January 8, 1996. Defendants also raised as an affirmative defense the claim that the contract was extended by agreement, course of dealing, and waiver. Finally, Defendants asserted a counterclaim for breach of contract. CIPS answered the Counterclaim on January 29, 1996. In February 1996, the Court allowed CIPS to amend its Complaint to include a claim for damages based on Atlas' alleged failure to timely deliver the agreed upon quantities of coal.

On January 19, 1996, creditors of Indiana Coal Company filed an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. On Indiana Coal's motion, the bankruptcy court converted the case to one under

Chapter 11. The bankruptcy court also modified the automatic stay to allow this case to proceed.

On March 19, 1996, after informing the Court that they had filed for bankruptcy under Chapter 11, Defendants filed an Amended Answer and Counterclaim. CIPS answered the Amended Counterclaim on March 27, 1996 and raised three affirmative defenses. CIPS added a fourth affirmative defense later.

### E. *Pending Motions*

The parties filed four distinct motions for partial summary judgment. Each motion addresses a different part of this multifaceted contract dispute. The first motion is CIPS' Motion for Summary Judgment on Count I of the Complaint for Declaratory Judgment and Against Atlas Minerals, Inc. and Indiana Coal Company on Counter–Plaintiff's Amended Counterclaim. In this motion, CIPS asks the Court to enforce the contract's termination date and to declare that CIPS performed all its obligations under the contract. CIPS argues that the contract's termination date was not modified in writing or waived.

The second motion is Atlas' Motion for Summary Judgment as to the Plaintiff's Complaint and for Partial Summary Judgment as to the Defendants/Counter–Plaintiffs' Counterclaim. In this motion, Atlas argues, based solely on the testimony of Rick Bartholomew, that the parties amended the contract to prohibit Buck Creek from filing force majeure claims and so that 1,350,000 tons of coal would be delivered, to be paid for when delivered, but at the price set for the year the coal should have been delivered under the contract. Atlas argues that the parties' course of performance of the contract supports their claim that the contract was amended to allow Atlas to deliver 1,350,-000 tons of coal, even if deliveries occurred after December 31, 1995.

The third motion is Atlas' Motion for Summary Judgment Upon the Affirmative Defenses raised by the Plaintiff/Counter–Defendant in Opposition to the Defendants/Counter–Plaintiffs' Counterclaim. This motion attacks all four of CIPS' affir-mative defenses to Atlas' Counterclaim, but focuses on the third and fourth affirmative defenses. CIPS' third affirmative defense states that even if the contract was amended to allow Atlas to make deliveries beyond December 31, 1995, the January 27, 1995 letter reimposed the previously waived termination date. CIPS' fourth affirmative defense states that the alleged amendment to the contract is barred by the statute of frauds.

The final motion for summary judgment was filed by CIPS. That motion argues that if Atlas is entitled to judgment on its Counterclaim, it is not permitted to recover consequential damages.

### SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "should be granted if the pleadings and supporting documents show that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Ruiz–Rivera v. Moyer,* 70 F.3d 498, 500–01 (7th Cir.1995). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Courts must consider evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

### III. ANALYSIS

The Court will only reach the first two motions for summary judgment and will dispose of this case entirely based on those motions. Specifically, the Court finds that CIPS never waived the December 31, 1995 termination date, so the contract must be enforced as written, at least with respect to the termination date. The Court, however, rejects CIPS' damages claim because CIPS

waived its right to enforce the contract's delivery schedule by acquiescing in Atlas' course of performance. Finally, the Court concludes that CIPS was not required to accept more than 250,000 tons of coal during 1995, as Atlas contends. Thus, CIPS is entitled to a declaratory judgment stating that CIPS has done all that the contract required and Atlas is entitled to judgment in its favor on Count II of the Amended Complaint.

## A. *The Law*

■ The contract in this case was one for the sale of goods, namely coal. Accordingly, it is governed by Article 2 of the Illinois Commercial Code, found at 810 ILCS §§ 5/2–101 to 5/2–725 (West 1993).[2] Under the UCC, the instant contract is considered one between merchants. UCC § 2–104 (defining merchants as those "who deal in goods of the kind" or hold themselves out "as having knowledge or skill peculiar to the practices or goods involved in the transaction").

To resolve the dispute in this case, the Court must reconcile and then apply three parts of the UCC. The first is the UCC provision that allows contracting parties to agree that their written contracts may not be modified except by a signed writing. The *second* is the UCC provision that allows "attempts at modification" to waive terms in a written contract, despite a clause in the contract allowing only written and signed modifications. The *third* provision is the UCC's rule on course of performance, which states that although course of performance is generally an interpretive tool, it may also be relevant to show a waiver of any terms inconsistent with the course of performance.

Unlike the common law, which takes a skeptical view of contract provisions requiring modifications to be in writing, *see Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1394 (7th Cir.1991) (reciting the common law principle that parties may orally modify a contract even after they include a contract provision requiring modifications to be in writing), the UCC strictly enforces such provisions. *See Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1284–85

(7th Cir.1986), 1 James J. White & Robert S. Summers, Uniform Commercial Code 40 (4th ed.1995). In § 2–209(2), the UCC states: "A signed agreement which excludes modification or rescission except by a signed writing cannot otherwise be modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party."

■ Not unlike the common law, however, the UCC provides some relief to parties who have agreed in writing that their agreement may not be changed except in writing and who have then performed or orally agreed to perform in a manner different from that specified by the written contract. In § 2–209(4), the Code provides that "[a]lthough an attempt at modification or rescission does not satisfy the requirements of [§ 2–209(2)] it can operate as a waiver." The leading case on §§ 2–209(2) and (4) is *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280 (7th Cir.1986). In that case, the United States Court of Appeals for the Seventh Circuit, applying Wisconsin's Uniform Commercial Code, rejected a claim that delivery dates in a contract had been modified because the party asserting modification had not identified a written modification. *Id.* at 1284–85. The court then examined whether the parties had waived the delivery dates by virtue of an attempted modification. The court concluded that to prove that an attempt at modification led to a waiver, the party asserting waiver must prove not only the existence of an oral modification (or other modification that does not comply with the contract's terms) but must also prove that it relied on the alleged waiver. *Id.* at 1287–88; *see also American Suzuki Motor Corp. v. Bill Kummer, Inc.*, 65 F.3d 1381, 1386 (7th Cir.1995) ("An attempted modification by words or conduct, however, operates as a waiver only if the party seeking to enforce the attempted modification reasonably relied on the attempted modification."). The rule requiring reliance to prove a waiver by an attempt at modification prevents one party to a contract from using self-serving testimony

**2.** This body of law is known generally as the Uniform Commercial Code or UCC. The Court

will refer to the UCC's provisions by their internal section numbers.

to prove that the other party waived a right under the contract. *Cole Taylor Bank v. Truck Insurance Exchange,* 51 F.3d 736, 739 (7th Cir.1995).

■■■ To add another layer of complexity, UCC § 2–208 also speaks to the issue:

Course of Performance or Practical Construction. (1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and the opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, the express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (Section 1–205).

(3) Subject to the provision of the next section on modification and waiver, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.

By its terms, § 2–208 is primarily an interpretive tool. *See* § 2–208(1) (course of performance "shall be relevant to determine the meaning of the agreement"); § 2–208, cmt. 1 ("This section ... rounds out the set of factors which determine the meaning of the 'agreement' ...."); *see also Wagner Excello Foods v. Fearn International, Inc.,* 235 Ill. App.3d 224, 176 Ill.Dec. 258, 264, 601 N.E.2d

956, 962 (1st Dist.1992) (noting that course of performance is often used to determine the meaning of an agreement). Section 2–208 also permits course of performance to "show a waiver or modification of any term inconsistent with" the contracting parties' course of performance. § 2–208(3). Section 2–208(3), however, states that course of performance can only show waiver or modification of inconsistent terms "[s]ubject to the provisions of" § 2–209. This qualification seems intended to achieve a limited purpose: subjecting waivers by course of performance to § 2–209(5) which allows retraction of a waiver. § 2–208, cmt. 3 ("Where it is difficult to determine whether a particular act merely sheds light on the meaning of a term of the agreement, the preference is in favor of 'waiver' whenever such construction, plus the application of the provisions on reinstatement of rights waived ... is needed to preserve the flexible character of commercial contracts and to prevent surprise or other hardship.").[3]

■■■ Waiver is not defined in the UCC, but its meaning is well established. Generally, "waiver in contract law is the intentional relinquishment of a known right." *Sethness–Greenleaf, Inc. v. Green River Corp.,* 65 F.3d 64, 67 (7th Cir.1995). "Illinois requires that an alleged waiver either have induced reliance or that it be clearly inferable from the circumstances." *Cole Taylor Bank,* 51 F.3d at 739 (emphasis in original) (citing *Lavelle v. Dominick's Finer Foods, Inc.,* 227 Ill.App.3d 764, 769, 169 Ill.Dec. 800, 804–05, 592 N.E.2d 287, 291–92 (1st Dist.1992), *Tibbs v. Great Central Insurance Co.,* 57 Ill.App.3d 866, 15 Ill.Dec. 146, 147, 373 N.E.2d 492, 493 (5th Dist.1978)).

■■■ The burden is on Atlas to prove that CIPS waived any provisions of the writ-

---

**3.** In this case, the only question is whether the parties waived any of the contract's provisions. The contract precluded all modifications except those written and signed by both parties. Section 2–209(4) only allows attempts at modification to constitute waivers. Section 2–208(3) allows course of performance to show either a waiver or a modification of a term inconsistent with the course of performance. But since that section is expressly subject to § 2–209's provisions on modification, it appears that the question here is limited to whether any terms of the contract were waived by course of performance.

Waiver and modification are distinct concepts. "[I]f the court asks whether the conduct of the parties amounted to a 'modification,' it will determine whether there was assent by applying the usual rules for the formation of contracts; if the court asks whether the conduct amounted to a 'waiver,' it may give effect to more dubious manifestations of assent." 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.5 at 375 (1990).

ten contract. *See Wisconsin Knife Works,* 781 F.2d at 1285. Waiver seems like a factual issue. However, when the relevant facts of the case are undisputed and only one possible inference may arise from those facts, waiver is a legal question. *Wagner Excello Foods, Inc.,* 176 Ill.Dec. at 264, 601 N.E.2d at 962. Thus, to win on its waiver claims, Atlas must show, by reference to undisputed facts, that CIPS intentionally relinquished its right under the contract.

### B. The *Termination Date*

#### 1. The Contract

In contract law, the place to start is with the written contract, if there is one. In this case, the parties—both sophisticated participants in the coal market—signed a detailed written contract. The contract ended by its terms on December 31, 1995 and it stated that the parties could not modify it unless they did so in a writing signed by both parties. UCC § 2–209(2) provides an easy answer, initially Atlas admits that no written modification exists which alters the December 31, 1995 termination date. Thus, under the terms of the contract (which are fully enforceable under § 2–209(2)) the termination date remained December 31, 1995.

#### 2. Attempt at Modification?

The Court, then, must pass to the next question under UCC § 2–209: did the parties attempt to modify the contract's termination date, and if so, does their attempt support Atlas' claim that CIPS waived the termination date? From the facts the Court has already recited, it is obvious that the parties did not attempt to modify the termination date of the contract. Additionally, nothing in CIPS' conduct suggests that CIPS intentionally relinquished its right to cease performance on December 31, 1995.

The contract provided for coal deliveries in the years 1990–95. Problems with deliveries began in 1990. At that time, Atlas sought to declare a force majeure with respect to 69,-629 tons of coal to be delivered in 1990. CIPS' December 12, 1990 letter shows that CIPS did not want to excuse delivery of that coal under the contract's force majeure clause and instead wanted to work out an alternate schedule for delivery of the 1990 shortfall. Initially, CIPS proposed taking deliveries of coal in 1996. Indeed, the initial proposal was for Atlas to make up the 1990 shortfall by delivering 15,000 tons of coal in both 1994 and 1995 and 39,629 tons in 1996. On February 18, 1991, Atlas wrote to CIPS with a revised proposal for making up the shortfall. In that letter, Atlas suggested the same deliveries for 1994 and 1995 but proposed that CIPS could take 39,629 tons in addition to "contract tonnage elected by [CIPS]—1996." By the time CIPS sent its proposed formal letter agreement to Atlas on March 6, 1991, the proposal was for CIPS to have an option to purchase 39,629 tons of coal in 1996. Atlas' March 21, 1991 response to that proposal stated: "During 1996, CIPS shall have the option to receive 39,629 tons."

Atlas claims that the contract was amended in early 1991 to bar the parties from filing further force majeure claims and to allow Atlas to deliver all 1,350,000 tons of coal contemplated by the agreement, regardless of the year of delivery. The parties' correspondence does not support either claim. Even if the correspondence and discussion of the parties can be considered "an attempt at modification" under UCC § 2–209(4), the attempted modification dealt only with the 1990 tonnage shortfall. Additionally, the best evidence of the extent of the purported attempted modification are the letters of March 6, 1991 and March 21, 1991 and neither letter discusses modifying the contract's termination date or barring the parties from filing force majeure claims. At best, the letters show that the parties agreed to make up the 1990 tonnage shortfall as quickly as possible with CIPS having an *option* to buy coal in 1996.

The overall course of events further limits the impact of the March 1991 letters. By the end of 1991, Atlas had delivered 274,034 tons of coal. CIPS paid the 1990 contract price for the first 69,629 tons. Neither side protested this; therefore, the issue of the 1990 tonnage shortfall was resolved. The discussions regarding the 1990 tonnage shortfall were the last time until early 1995 that the

parties expressly discussed the contract's termination date.

Of course, delivery problems did not end with the 1990 tonnage shortfall. As just noted, Atlas came up 45,325 tons short by the end of 1991. To remedy this situation, Atlas proposed a delivery schedule for 1992 that would have made up that deficit and ended 1992 with a delivery *surplus*. By the end of 1992, however, Atlas still lagged behind in deliveries and proposed to deliver any "1992 carry-over tonnage at 1992 contract pricing." This routine continued, with Atlas falling farther and farther behind on deliveries, until December 1994. Despite the fact that it was becoming increasingly difficult to do so, it appears from all of the evidence that the parties intended to make up all of the tonnage shortfalls by the end of 1995. And nothing in the record indicates that the parties discussed going beyond that year.

The parties' agreement for 1995 deliveries, the agreement that allowed the Buck Creek mine to stay open, expressly barred deliveries in 1996. When the Atlas mine shut down in December 1994, it reopened only after assurances by CIPS that it would continue to accept coal in 1995. In response to CIPS' notice of termination and demands for adequate assurances, Atlas proposed a delivery schedule that would have spanned 1995 and 1996. In a counteroffer, CIPS said it would accept coal on a probationary basis in 1995 only. Atlas' representative accepted this proposal by leaving a telephone message for CIPS stating that Atlas would resume shipments within the next few days. Again, to the extent the January 1995 negotiations can be considered "an attempt at modification," the modification consisted of reinstating the contract (which would have terminated in July 1995 if CIPS had not agreed to accept deliveries for all of 1995) for the purpose of delivering coal in 1995 only.

The preceding summary demonstrates that the parties never attempted to modify the termination date. At the very least, the evidence shows that modifying the termination date was initially placed on the bargaining table, but subsequently withdrawn. Other evidence—evidence of Atlas' own conduct—shows that Atlas never believed that CIPS had agreed to extend the contract beyond 1995. In its January 1992 financing proposal to Old National Bank, Atlas repeatedly stated that its contract with CIPS terminated at the end of 1995. Atlas alleges that the parties amended the contract to extend beyond December 31, 1995 sometime in early 1991. If so, why didn't Atlas share that information with its bank? Furthermore, in mid 1995, Atlas sought to negotiate a contract extension, another strange act if Atlas believed that CIPS had already agreed to accept deliveries in 1996 and beyond.

Even if the facts could support a claim that the parties attempted to modify the contract's termination date, the facts do not permit a finding that that provision was waived. To prove a waiver, Atlas would have to show that CIPS intentionally relinquished its right to cease performance on December 31, 1995. *See Sethness–Greenleaf, Inc.,* 65 F.3d at 67 (stating that a waiver requires intentional relinquishment of a known right). The evidence reveals no conduct which could possibly show that. Finally, Atlas makes a great deal out of the fact that CIPS never explicitly withdrew its proposal to accept deliveries in 1996. Atlas apparently means to rely on UCC § 2–209(5) but that provision is inapplicable because CIPS never waived the termination date.

### 3. Course of Performance

 The final step under the UCC is to determine whether course of performance might play a role in deciding whether the contract terminated on December 31, 1995. Course of performance is primarily an interpretative tool. UCC § 2–208(1) (stating that course of performance "shall be relevant to determine the meaning of the agreement"); *Sethness–Greenleaf, Inc.,* 65 F.3d at 67 (" '[C]ourse of performance' can be used to flesh out an ambiguous or incomplete agreement."). As far as the termination date is concerned, the contract was neither ambiguous nor incomplete. Thus, course of performance is only relevant to the extent it is evidence of a waiver. § 2–208(3).

 The course of performance under the contract was that until 1995, whenever

Atlas was unable to deliver a year's tonnage, CIPS allowed Atlas to deliver that tonnage in following years, but at the price stated in the contract for the year Atlas should have delivered the coal. That course of performance has implications for the contract's internal delivery schedule, but not for the termination date. There is no course of performance that might shed light on the validity or meaning of the termination date provision. And even if CIPS had taken coal after December 31, 1995, a single instance of conduct does not amount to course of performance. *See* § 2–208, cmt. 4 ("A single occasion of conduct does not fall within the language of this section...").

■ Furthermore, to the extent that performance within the contract's term is relevant to interpreting or applying the termination date, the Court must first decide if that course of performance may be reasonably construed consistently with the termination date. § 2–208(2) ("The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, the express terms shall control course of performance...."). The parties abandoned the internal delivery and price schedules to allow Atlas to make up shortfalls—that much is evident in their conduct and communications. It is not inconsistent with that course of performance to conclude that performance should cease on the contract's termination date. Indeed, the parties' correspondence and conduct demonstrates that they abandoned the internal delivery and price schedules in order to make up shortfalls before the end of the contract. Thus, the Court can construe the termination date and the course of performance (i.e. abandoning the internal delivery and price schedules) consistently with each other, so the Court need not disregard the express term (the termination date). In any event, when the terms of a contract conflict with the course of performance, § 2–208(2) provides that the express terms govern. Accordingly, even if the course of performance and the termination date cannot be construed consistently with each other, the termination date would control.

In summary, the Court finds as follows: (1) the parties did not modify the contract's termination date in writing, as the contract required; (2) the parties did not attempt to modify the contract's termination date so that term could not have been waived; and (3) there is no course of performance relevant to interpreting or applying the contract's termination date. Accordingly, the parties' contractual obligations ceased on December 31, 1995.

### C. *Count II of the Amended Complaint*

■ In Count I of its Amended Complaint and in its main motion for summary judgment, CIPS points to the contract's termination date and the provision prohibiting oral modifications and says that it had no obligation to continue receiving coal after December 31, 1995. The Court agrees and will grant summary judgment in favor of CIPS on Count I and on Atlas' Amended Counterclaim, at least with regard to the termination date issue. In Count II, however, CIPS, seeks to have its cake and eat it too: CIPS wants damages because Atlas failed to timely deliver the amounts of coal specified by the contract for the years 1990 to 1994. CIPS, however, allowed Atlas to deliver coal late *during the term* of the contract in the expectation that Atlas would eventually make up all previous shortfalls. By permitting—indeed encouraging—Atlas to make late deliveries so that CIPS could get coal at a below-market price, CIPS waived its right to strictly enforce the contract's internal delivery schedule.

As with the termination date, the parties did not agree in writing to modify the schedule of deliveries and prices specified in the contract. But unlike the termination date, the parties attempted to modify the internal delivery schedule to allow Atlas to make up tonnage shortfalls. Furthermore, the parties engaged in a course of performance that casts doubt on the enforceability of the delivery schedule.

■ Although the Court has concluded that CIPS did not waive its right to cease

performance on December 31, 1995, the Court concludes that CIPS did waive its right to strictly enforce the delivery schedule provided in the contract. Under § 2–209(4), attempts at modification can signify waivers of contractual provisions. The Court could certainly string together much of the parties' conduct in this case to show that they attempted to modify the delivery schedule on numerous occasions, and that those attempts led to reliance by Atlas on the looser delivery schedule. *See Wisconsin Knife Works,* 781 F.2d at 1288 (holding that to show a waiver based on an attempted modification, the party asserting waiver must prove reliance). An easier and more straightforward approach is to look at the course of performance under the contract. UCC § 2–208(3) provides that course of performance may be relevant to show waiver. 1 James J. White & Robert S. Summers, Uniform Commercial Code 46–47 (4th ed. 1995) ("This section not only · can operate to fill gaps in agreements or to interpret agreements.... It can also modify or waive the express terms of an agreement."). Analysis under § 2–208 is simple: The contract called for repeated occasions for performance (yearly coal deliveries). CIPS allowed Atlas to miss the yearly delivery targets in 1990, 1991, 1992, 1993, and 1994. Thus, the parties engaged in a course of performance as defined in § 2–208(1). That course of performance waived the internal delivery schedule. *See Wagner Excello Foods v. Fearn International, Inc.,* 235 Ill.App.3d 224, 176 Ill.Dec. 258, 264–65, 601 N.E.2d 956, 962–963 (1st Dist.1992) (finding waiver of a delivery schedule where the seller lulled the buyer into believing that the seller would not require strict compliance with the schedule).

In light of the course of performance in which CIPS permitted Atlas to make up yearly tonnage shortfalls in the hope that Atlas would eventually make up the entire shortfall, the Court cannot permit CIPS to recover for damages arising out of Atlas' tardy deliveries of coal.[4] Accordingly, the Court will grant summary judgment for Atlas and against CIPS on Count II.[5]

### D. *Atlas' Right to Deliver More Than 250,-000 Tons of Coal in 1995*

Atlas complains that CIPS should have allowed it to deliver more than 250,000 tons of coal during 1995. Atlas argues that when the parties waived the internal delivery schedule, they meant to allow Atlas to deliver 1,350,000 tons of coal no matter when. The Court has already concluded, however, that neither the course of performance nor any attempt at modification of the contract supports that bold claim. Atlas' fall back position is that if the contract terminated on December 31, 1995, CIPS was bound to accept as much coal as Atlas could deliver before that date. The Court also rejects that claim. Instead, the Court finds that the parties reached a new agreement in January 1995 under which CIPS was only bound to accept 250,000 tons of coal. This agreement was either (1) a fresh contract entered into after the original contract had been terminated or (2) an attempt at modification of the contract, as previously modified by course of performance, which waived Atlas' right to deliver more than 250,000 tons of coal in 1995.

In December 1994, after Atlas lost its contract with Hoosier Energy, the Buck Creek mine shut down completely, even though the part of the mine that supplied the Merom plant was distinct from the part that supplied the CIPS' Newton plant. In response to that action, CIPS informed Atlas that it was exercising its right, under Article XIV of the

---

4. CIPS asserts that material questions of fact preclude summary judgment on Count II of its Amended Complaint. CIPS, however, fails to identify any relevant factual disputes regarding waiver of the delivery schedule. Instead, the facts reveal that CIPS allowed and encouraged late deliveries and CIPS' officials admitted as much in their depositions.

5. This conclusion works against both CIPS and Atlas: CIPS cannot claim damages for late deliveries and Atlas cannot claim damages it may have suffered as a result of selling coal in later years at previous years' prices. This fact is not dispositive of any part of this case, but counters Atlas' repeated assertions that it suffered damages when CIPS took late deliveries of coal and paid for them at the price applicable to the year Atlas should have delivered the coal. Just as CIPS may not claim damages for the late deliveries, Atlas may not claim damages for the lower price.

contract, to terminate the agreement. Article XIV provides:

> If for whatever reason, including excused Force Majeure events, the delivery or purchase of more than Fifty percent (50%) of the minimum tons of coal to be supplied or received during a continuous Six (6) month period or longer is prevented, then the party not responsible for the deficiency, [sic] may, on One Hundred Eighty (180) days written notice terminate this Agreement; provided that if the conditions which caused the deficiency are eliminated prior to the effective date of termination, the termination right is voided.

When CIPS issued its notice of termination, the Buck Creek mine was closed. At that time, Atlas and Buck Creek were trying to negotiate for financing so they could reopen the mine, but when their bank heard that CIPS intended to terminate the contract, the bank balked. The parties then met to determine how much coal CIPS would take in 1995 (and Atlas hoped, in 1996). Atlas proposed deliveries in both 1995 and 1996. CIPS made a counteroffer, its January 27, 1995 letter, in which it offered to buy 250,000 tons of coal in 1995, at 1993 and 1994 prices. CIPS explicitly stated that it would take no coal in 1996. Shortly after receiving CIPS' counteroffer, Atlas' Bartholomew telephoned CIPS' Kirchner to say that Atlas planned to resume deliveries based within days. Atlas then resumed deliveries according to the schedule CIPS supplied in its January 27, 1995 letter.

These events satisfy the basic requirements of a valid contract: offer, acceptance, and consideration. Atlas made an offer, CIPS made a counteroffer, and Atlas accepted the counteroffer (both by its telephone message and by its performance in conformity with the counteroffer). Mutual consideration came from CIPS' obligation to buy 250,000 tons of coal in 1995 and from Atlas' obligation to sell that much.

The parties reached this agreement at a time when the Buck Creek mine was closed and producing no coal. Atlas and Buck Creek were trying to reopen the mine, but needed financing to do so, and their bank would not proceed unless it received assurances from the mine's customers that they would accept coal. In the midst of the mine's negotiations with the bank, CIPS announced that it intended to terminate the contract effective July 13, 1995. According to Article XIV of the contract, the parties' relationship would end on that date unless Atlas remedied all of its previous problems and performed according to the contract for six months. CIPS could have simply sat back and awaited deliveries, although it is unlikely any would have come. Instead, CIPS agreed to provide assurances about how much coal it would buy in order to allay the fears of Atlas' lender.

■ The most straightforward way to understand the January 1995 agreement is as a new contract. The parties reached that agreement at a time when their existing contract was doomed to fail; and the new agreement contained conditions not found in the original document (most notably a provision allowing CIPS to cancel the contract immediately if Atlas failed to perform for two months). Under this view, CIPS' January 27, 1995 letter reflects the sum of the parties' agreement during 1995 and precludes Atlas' claim that it could deliver more than 250,000 tons of coal in 1995.

Alternatively, the January 1995 agreement can be considered an attempt at modification which under UCC § 2–209(4) waived any right Atlas had to deliver more than 250,000 tons of coal in 1995. Assuming that the course of performance would have allowed Atlas to deliver more than 250,000 tons of coal in 1995 in order to make up the cumulative shortfall, that course of performance modified the contract. The January 27, 1995 letter and Atlas' subsequent performance waived Atlas' right to deliver more than 250,000 tons of coal in 1995. CIPS relied on Atlas' waiver of any right to deliver more than 250,000 tons of coal in 1995 because CIPS continued to obtain coal from other sources to cover its needs above 250,000 tons. If Atlas had the right to deliver more than 250,000 tons in 1995, despite the January 1995 agreement, then CIPS would have been burdened with an enormous inventory surplus.

## IV. CONCLUSION

The parties in this case entered into a five year contract for the sale and purchase of coal. The contract had both a fixed end date and fixed delivery and price schedules. Because the coal mine could not produce according to the contract, the parties abandoned the delivery and price schedules in the hope that the mine would catch up before the contract terminated. At the beginning of the contract's final year, the mine shut down and reopened only after CIPS agreed to buy only as much coal that year as it had originally promised.

In this lawsuit, Atlas has claimed that the parties modified the contract in various ways. Atlas cannot prove most of those claims. The only alteration the Court finds was of the internal delivery and price schedules, which the parties waived. Accordingly, the Court will enforce the contract's termination date, but will not permit CIPS to recover damages for late deliveries that occurred during the contract's term.

In short, the Court finds that both parties to this contract may simply walk away from the contract. CIPS was not obliged to accept any more coal than it did. Atlas and Indiana Coal performed as required under the contract, as modified by course of performance. Neither side owes the other any damages. This result is no doubt of little comfort to Indiana Coal, which is now in bankruptcy. But in light of the mine's miserable performance during the term of its contract with the utility, the Court cannot justly place blame anywhere but with the mine.

*Ergo,* Plaintiff's Motion for Summary Judgment on Count I of the Complaint for Declaratory Judgment and Against Atlas Minerals, Inc. and Indiana Coal Company on Counter–Plaintiffs' Amended Counterclaim is ALLOWED. Defendants' Motion for Summary Judgment as to the Plaintiff's Complaint and for Partial Summary Judgment as to the Defendant/Counter–Plaintiff's Counterclaim is ALLOWED in part and DENIED in part. Defendants' Motion for Summary Judgment Upon the Affirmative Defenses Raised by the Plaintiff/Counter–Defendant in Opposition to the Defendant/Counter–Plain-tiffs' Counterclaim and Plaintiff's Motion for Summary Judgment on the Issue of Consequential Damages are DENIED as moot.

The Clerk of the Court is directed to enter judgment in favor of Plaintiff and against Defendants on Count I of the Amended Complaint, in favor of Defendants and against Plaintiff on Count II of the Amended Complaint, and in favor of Plaintiff and against Defendants on the Amended Counterclaim. Each party shall bear its own costs.

CASE CLOSED.