CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Plaintiff–Appellee, Cross Appellant,

v.

ATLAS MINERALS, INCORPORATED, and Indiana Coal Company, formerly known as Buck Creek Mining, Incorporated, Defendants–Appellants, Cross Appellees.

Nos. 97–2503, 97–2596.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1998.

Decided May 29, 1998.

Stephen R. Kaufmann, Thomas H. Wilson (argued), Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, IL, for Plaintiff–Appellee.

Craig A. Randle, Londrigan, Potter & Randle, Springfield, IL, Charles A. Wagner, III (argued), Wagner, Myers & Sanger, Knoxville, TN, for Defendants–Appellants.

Before CUDAHY, FLAUM and EVANS, Circuit Judges.

CUDAHY, Circuit Judge.

This is a diversity case applying Illinois sales law to a dispute between Indiana corporations (defendants) and an Illinois corporation (plaintiff). The issue is whether the plaintiff breached a June 22, 1989 Coal Sale and Purchase Agreement between Atlas Minerals, Inc., and Buck Creek Mining, Inc., and the plaintiff (the 1989 contract). (Defendant Indiana Coal Company is a successor to Buck Creek Mining.) The defendants appeal from a judgment granting plaintiff's motion for summary judgment on plaintiff's claim for declaratory relief and denying defendants' motion for summary judgment on defendants' amended counterclaim.

## Background

We will just summarize the background events, which are described in detail by the district court in its published opinion. *See* 965 F.Supp. 1162, 1165–71 (C.D.Ill.1997). Under Article III of the 1989 contract, the defendants (Atlas) would supply the plaintiff (CIPS) 100,000 tons of coal from June 1 to December 31, 1990, and then between 235,000 and 250,000 tons per year in 1991, 1992, 1993, 1994 and 1995. Under Article X, the price per ton was scheduled to rise roughly one dollar each year. In November 1990, Atlas informed CIPS that because of problems at its mine it wished to excuse a shortfall of 69,629 tons. Apparently as a result of these problems, Atlas delivered only 274,304 tons of coal through 1991. CIPS paid for the first 69,629 of those tons at the 1990 contract price. CIPS paid the 1991 price for the remaining 204,675 tons, leaving a shortfall of 45,325 tons for 1991. In 1992, Atlas delivered 167,387 tons. CIPS paid for the first 45,325 tons at the 1991 price, the rest at the 1992 price. During 1993 Atlas's miners went on strike, and only 83,605 tons were delivered, all sold at the 1992 price. In 1994, Atlas shipped 129,756 tons; Atlas paid for the first 44,333 tons at the 1992 price and the balance at the 1993 price.

When one of Atlas's major contracts was not renewed at the end of 1994, it curtailed operations at its mine. When CIPS learned of this, CIPS sent Atlas a notice of termination of the contract, effective June 13, 1995, *see* Appellants' Supp.App. 50, pursuant to a provision in the contract allowing either party to terminate if the other failed to perform with respect to 50 percent of the required tonnage during a six-month period. (Under the contract that termination right would be voided if the conditions causing the

deficiency were eliminated before that effective date. *Id.* at 16.) By letter dated January 16, 1995, Atlas informed CIPS that "the implementation of our re-opening plan is dependant upon our ability to provide our lender with assurances relative to the marketing of our coal." Supp.App. of Appellee/Cross-Appellant 31. The letter solicited such assurances from CIPS: "As you know, our sales to CIPS have been an integral part of our overall marketing effort. We would appreciate your review of our plan to return the mine to the indicated production levels and your response regarding our proposed shipments to CIPS during the remainder of 1995 and 1996." *Id.* In response, on Friday, January 27, 1995, CIPS faxed a letter to Atlas stating that CIPS would accept coal deliveries during 1995 on a probationary basis, but would not commit to accepting any coal beyond December 31, 1995. About one hour and fifteen minutes later, Atlas's marketing vice president Rick Bartholomew called CIPS's fuel procurement supervisor Dennis Kirchner and left a voice mail message stating that Atlas would resume shipments the following Monday morning. (The message, we learned at oral argument, has been preserved to this very day on Kirchner's voice mail.)

Atlas shipped 250,048 tons of coal during 1995, the most CIPS would take. CIPS paid the 1993 price for the first 164,577 tons and the 1994 price for the balance. CIPS refused to accept any additional coal after 1995, despite Atlas's insistence that CIPS was obligated to accept delivery into 1996 and beyond.

CIPS filed suit for a declaratory judgment on December 1, 1995, seeking a declaration that it had no obligation to accept additional coal after 1995 and that it "has fully complied with its obligations" under the 1989 contract. Atlas responded that CIPS breached the 1989 contract by refusing to buy 414,529 tons of Atlas's coal, and that whether or not the contract terminated at the end of 1995, CIPS breached the contract by refusing to accept more than 250,000 tons of coal in 1995, *see* Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. & in Further Supp. of Defs.' Mot. for Partial Summ. J. 21. The district court concluded that CIPS was under no contractual obligation to buy any coal from Atlas after 1995, and bought all the coal it was required to buy in 1995—250,000 tons. The court rejected Atlas's position that CIPS waived Article II, § 2.02 of the 1989 contract, which specified that the contract terminated on December 31, 1995. *See* 965 F.Supp. at 1174–76. The district court was persuaded by Atlas's argument that CIPS waived the 1989 contract's internal delivery schedule spelled out in Article III—so CIPS was not entitled to any damages, *see id.* at 1176–77, but the court decided that in January 1995, the parties agreed that CIPS was not obligated to accept more than 250,000 tons of coal in 1995, *see id.* at 1177–78.

## Discussion

Atlas appeals on the grounds that CIPS must have waived Article II (the termination date) if it waived Article III (the delivery schedule): "The waiver of either without the waiver of the other would be meaningless," Br. & Short App. of Appellants 29, and that there was no agreement in January 1995, because even assuming that CIPS made an offer, it was not accepted, *see id.* at 45–48. We review the district court's decision to grant summary judgment de novo, *see Salve Regina College v. Russell,* 499 U.S. 225, 235, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991); *Target Market Pub. v. ADVO, Inc.,* 136 F.3d 1139, 1141 (7th Cir.1998), applying the same criteria the district court must use, *see* Fed. R.Civ.P. 56(c); *ADVO,* 136 F.3d at 1141; *see also* 965 F.Supp. at 1171.

Atlas asserts that CIPS's fax of January 27, 1997 (the fax), and Atlas's subsequent actions demonstrate neither consideration nor acceptance. Atlas concedes, however, that under sales law consideration need not be shown here. *See* 810 Ill. Comp. Stat. 5/2–209(1). Actually, Atlas denies that the fax was even an offer, *see* Br. & Short App. of Appellants 43, but that denial is merely a rhetorical flourish unsupported by any analysis. The fax was in the form of an offer, and it invited acceptance by Atlas: "CIPS is willing to accept shipments from the Buck Creek Mine on a probationary basis during 1995 if the following conditions, necessitated by our past history, are accepted by Atlas Minerals...." Appellants' Supp.App. 35. In gen-

eral, "an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances." 810 Ill. Comp. Stat. 5/2–206(a). Atlas's January 30, 1995 shipment of goods was an objectively reasonable indication that Atlas accepted CIPS's offer. *See id.* 5/2–206(1)(b); *Allied Steel and Conveyors v. Ford Motor Co.,* 277 F.2d 907, 911–13 (6th Cir.1960); *cf. Nasco, Inc. v. Dahltron Corp.,* 74 Ill.App.3d 302, 30 Ill.Dec. 242, 392 N.E.2d 1110, 1115–16 (1979) ("[A] binding contract came into being when the plaintiff Nasco began to execute the defendant's order.").

■ Atlas argues that its delivery of coal could not indicate acceptance because it had a right to deliver the coal, *see* Br. & Short App. of Appellants 42, 43, 47. Atlas's right to deliver the coal, however, is irrelevant to whether the delivery constituted acceptance: it would be odd if acceptance had to be manifested by prohibited conduct. "Ordinarily the making of an offer does not limit the offeree's freedom of action or inaction; he may act or forebear without reference to the offer. But if he has reason to know that the offeror may reasonably infer from his conduct that he assents, he runs the risk of being bound by his manifestation of assent." Restatement (Second) of Contracts § 53 cmt. b (1981). The implication of Rick Bartholomew's January 27 voice mail message, "we had planned on after reviewing the [fax] resuming shipments to Newton Monday morning," was that a resumption of shipments on January 30 would indicate acceptance of the terms of the fax.

Atlas emphasizes Bartholomew's subjective interpretation of the fax, but his subjective understanding is also irrelevant. *See, e.g., Klos v. Lotnicze,* 133 F.3d 164, 168 (2d Cir. 1997). And Atlas misrepresents the portion of Dennis Kirchner's testimony, quoted in Atlas's brief, regarding the purpose of the fax. *See* Br. & Short App. of Appellants 46. Kirchner did not testify that "the purpose of the [fax] could not be discerned," *id.;* in fact, in the quoted testimony Kirchner explicitly confirms that a condition of the fax was that " 'the contract expired on December 31, 1995' ": " 'it's a condition in the [fax], yes.' " *Id.*

Atlas's argument that it had a duty to deliver the coal, while in principle not quite

so farfetched, is also not persuasive under these circumstances. The record indicates that Atlas had suspended shipments of coal, and there is no evidence that Atlas had a duty to resume shipments *on Monday, January 30, 1995.* CIPS's fax could not and did not prevent Atlas from complying with any duty it might have had to deliver coal, because Atlas could have simply notified CIPS that the shipment was not an acceptance, as the voice mail otherwise would have led CIPS to believe. *Cf.* Restatement (Second) of Contracts §§ 38 & cmt. a, 53(2).

■ Atlas does not argue that it provided CIPS with seasonable notice that the resumption of shipments was not an acceptance of the offer. Atlas does assert that a letter it sent to CIPS dated February 15, 1995, *see* Appellants' Supp.App. 39, contained "an expression of Atlas's intent to deliver all the remaining coal." Br. & Short App. of Appellants 47. But this letter fails to refer to the conduct that would otherwise constitute acceptance, and so would not support an argument that Atlas provided seasonable notice: the letter makes no reference to the resumption of shipments in January. In fact, the letter indicates that Atlas is proceeding to resume operations at the mine "based on ... the delivery schedule in the" fax, which would be difficult to interpret as a repudiation of the fax. If Atlas's conduct on January 27 and 30 constituted acceptance of CIPS's offer, it does not matter whether Atlas's February 15 letter expressed its intent to deliver all of the remaining coal.

Atlas further argues that *Robinson v. McKinley Community Servs., Inc.,* 19 F.3d 359, 364 (7th Cir.1994) (an employment case) established that performance of a contractual obligation cannot constitute acceptance. We conclude that the reasoning in *Robinson* is based exclusively on the absence of consideration in that case, and does not change the proper analysis of acceptance under the Illinois Uniform Commercial Code in this circuit. Further, in *Robinson,* this court refused to infer that an employee had consented to the terms of a new employment manual merely by continuing to work after the new manual was published. This is merely an unexceptional application of the principle that an offer cannot "impose liability on the

offeree that remains silent or continues in established ways." E. Allan Farnsworth, Contracts § 3.15 (2d ed.1990). Thus, Claudine Robinson might have stopped working, suggested that she might not be able to return to work unless she received certain assurances from her employer and, upon receiving those assurances, said she would return to work the next day after reviewing the manual. Under these facts, if she had returned to work the next day without comment, it might well have been permissible to infer her consent to the terms of the new handbook—particularly if her compensation, etc., did not depend on whether she returned to work on that particular day.

There was ample evidence that Atlas accepted the offer contained in the fax, and we therefore reject Atlas's position that it was entitled to summary judgment on the issue of CIPS's obligation to buy additional coal from Atlas in 1995. In itself, this evidence would not necessarily establish that CIPS was entitled to summary judgment on the point. But Atlas does not identify any material factual disputes that would require further proceedings; it merely states, without elaboration, that "[e]ven if the facts regarding the ... communications regarding the January 27, 1995 letter do not give rise to a judgment in favor of Atlas, they give rise to an issue of fact precluding summary judgment in favor of CIPS." Br. & Short App. of Appellants 49. This is not an adequate legal argument to defeat summary judgment.

■ While in many situations the best defense may be a good offense, an argument supporting a party's motion for summary judgment is not interchangeable with an argument against an opponent's motion for summary judgment. The premise of a motion for summary judgment is that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); an argument in opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e) (emphasis added). Of course, in the case of cross motions there may be some economy in presenting the arguments against granting summary judgment to one's opponent alongside the arguments in favor of one's own motion for summary judgment, rather than presenting the arguments sequentially. Atlas, however, has not present-

ed a substantial argument in opposition in any fashion. We therefore conclude that the parties are bound by the terms recited in the fax.

Our resolution of the dispute over the fax also resolves the question whether CIPS was obligated to accept coal after December 31, 1995. (At oral argument we gave Atlas an opportunity to explain why these questions were independent, but Atlas simply maintained that it never accepted the terms of the fax.) The fax stated that "CIPS is under no obligation and will make no commitment to purchase coal past the December 31, 1995 expiration date of the current agreement." Appellants' Supp.App. 37. The shipment schedule in the fax, which stipulated minimum tonnage for each month from February through December 1995, stated under the heading "1996," "None committed to at this time." *Id.* at 36. Accordingly, we affirm on the basis of the agreement reached in January 1995 even though the district court also relied on a construction of the original contract of June 1989. *See McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 796 (7th Cir.1997).

The judgment is AFFIRMED.