# Illinois Official Reports

## Appellate Court

*People v. Hadden*, 2015 IL App (4th) 140226

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JONATHON D. HADDEN, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket Nos. 4-14-0226, 4-15-0133 cons. |
| Filed | December 21, 2015 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 12-CF-554; the Hon. Robert L. Freitag, Judge, presiding. |
| Judgment | No. 4-14-0226, Affirmed.<br>No. 4-15-0133, Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Joel C. Wessol (argued), all of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and David E. Mannchen (argued), Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Harris and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1     In June 2012, the State charged defendant with solicitation of murder for hire (720 ILCS 5/8-1.2(a) (West 2010)). At defendant's February 2014 jury trial, the State introduced into evidence two audio-recordings of surreptitiously recorded conversations between defendant and two other people in which defendant spoke about killing his codefendant in another case. The jury found defendant guilty, and the trial court sentenced him to 25 years in prison.

¶ 2     On appeal, defendant argues that the (1) evidence was insufficient to prove him guilty beyond a reasonable doubt of solicitation of murder for hire and (2) trial court failed to inquire into defendant's posttrial claims of ineffective assistance of counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     In June 2012, the State charged defendant with solicitation of murder for hire, alleging that he procured Nathan Luster, who was an Illinois State Police undercover special agent, to commit first degree murder pursuant to an agreement whereby Luster would kill Michael Anderson–defendant's codefendant in a pending burglary case–in exchange for United States currency.

¶ 5     The following evidence was presented at defendant's February 2014 jury trial. In December 2012, defendant and Anderson were arrested and detained in the McLean County jail for a burglary that occurred at Bloomington Cycle and Fitness. In April 2013, Nidrell Lyons, an inmate and barber at the jail, contacted McLean County sheriff's detective Dave Fritts. The details of the conversation between Lyons and Fritts are not apparent in the record, but after talking with Lyons, Fritts set up a recorded overhear conversation between defendant and Lyons. The conversation took place on April 23, 2013, as Lyons cut defendant's hair in the jail's recreation room. The jury was permitted to hear the recording of the conversation.

¶ 6     The recording contained, in part, the following discussion between defendant and Lyons. Defendant blamed Anderson for his burglary arrest and stated that he wanted Anderson "gone." Defendant told Lyons that Anderson should be bonding out of jail the following day. Lyons said he would talk to his cousin, who could do "what you're trying to do" for $500, with the requirement that $250 be paid up front. Defendant responded that he could provide the full $500 up front. Later in the conversation, defendant said that he would pay Lyons' cousin $1,000, of which $500 would be provided up front. Defendant gave Lyons a phone number for defendant's girlfriend, whom Lyons' cousin could call after defendant had bonded out of jail. At the end of the conversation, Lyons asked, "You want him gone, right?" Defendant responded, "If that what he's willing to do–yeah."

¶ 7     Luster testified that he was contacted by the McLean County sheriff's office to participate in a surreptitiously recorded conversation with defendant. On May 9, 2013, Luster pretended to be a hit man during a conversation with defendant in the visiting area of the jail. Luster entered the jail as a regular citizen and wore plain clothes and a hidden audio-recording device. The jury was permitted to hear that audio recording.

¶ 8     The recording contained, in relevant part, the following discussion. Luster introduced himself to defendant as Lyons' cousin. Defendant initially sounded confused, as he was not expecting to meet with Lyons' cousin and no longer had contact with Lyons. Defendant told Luster that he could not pay Luster until he bonded out of jail. Defendant expected that after he

bonded out, he would acquire the money to pay Luster. Defendant explained that he expected his father to bond him out of jail that weekend. Defendant then gave Luster his girlfriend's phone number. Defendant explained that Luster should call his girlfriend that weekend and ask whether defendant had bonded out of jail. If she said yes, Luster should give her his phone number, and defendant would contact him to arrange payment. If defendant had not bonded out, "then it's pretty much dead." Defendant explained that if he was able to bond out, he would acquire money to also bond out Anderson and pay Luster.

¶ 9 Defendant gave Luster Anderson's full name and address so that Luster could "take a look." Defendant then gave Luster a description of the inside of Anderson's residence and identified where in the home Anderson would likely be located and where the security cameras were. Luster asked what specifically defendant wanted done to Anderson, and defendant responded, "I just want him gone." When Luster asked defendant to clarify what he wanted done to Anderson, defendant responded that he wanted Anderson "gone completely," he did not want Anderson seen from or heard from again. Defendant explained that he did not want Anderson to testify at defendant's burglary trial. Luster asked defendant where on Anderson's body he wanted Luster to shoot, but defendant did not answer that question.

¶ 10 Defendant testified that he "was just venting" when talking to Lyons. He stated he had no money and never intended to give Luster any money. Defendant believed that Luster would not take any action until and unless defendant paid him first. When defendant told Luster that he would bond out that weekend, he did not actually believe that he would bond out.

¶ 11 The jury found defendant guilty.

¶ 12 Later in February 2014, the cause proceeded to a joint sentencing hearing on defendant's charges of burglary and solicitation of murder for hire. During his statement in allocution, defendant asserted that he was "sold out" because trial counsel failed to obtain "a copy of [Lyons'] sentencing transcripts," and instead told defendant that they were not needed. Defendant also stated that he asked counsel to file a motion, which counsel did not do. (Defendant did not specify what kind of motion he asked counsel to file or whether it was related to the Lyons transcripts.) In addition, defendant argued that he was denied his right to a bench trial and that had his case proceeded to a bench trial, the trial court would have found him not guilty. As to sentencing, defendant asked for a sentence less than the statutory minimum.

¶ 13 The trial court responded that the evidence against defendant was "more than enough" to find him guilty. The court rejected defendant's contention that he was denied his right to a bench trial, noting that defendant never requested a bench trial. The court asserted further that had the case proceeded to a bench trial, the court would have found defendant guilty. The court did not address defendant's statements about his counsel's performance. The court sentenced defendant to 5 years in prison for burglary and 25 years for solicitation of murder for hire, to run consecutively.

¶ 14 This direct appeal of defendant's conviction followed (case No. 4-14-0226).

¶ 15 In November 2014, while defendant's direct appeal was pending in this court, defendant filed in the trial court a petition for postconviction relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 to 122-7 (West 2014)), in which he argued that he was denied his sixth amendment rights to cross-examine Lyons and to the effective assistance of counsel. The court summarily dismissed the petition, finding it frivolous and patently without merit. Defendant appealed that decision (case No. 4-15-0133).

¶ 16       On defendant's motion, we consolidated defendant's appeals.

¶ 17                II. ANALYSIS

¶ 18       Defendant argues that the (1) evidence was insufficient to prove him guilty beyond a reasonable doubt of solicitation of murder for hire and (2) trial court failed to inquire into defendant's posttrial claims of ineffective assistance of counsel. We disagree with both contentions. Defendant does not raise any argument regarding the summary dismissal of his postconviction petition (case No. 4-15-0133).

¶ 19                A. Sufficiency of the Evidence

¶ 20       Defendant argues that the evidence at trial was insufficient to prove him guilty beyond a reasonable doubt of solicitation of murder for hire. Specifically, he argues that the evidence was insufficient to prove that an "agreement" existed between defendant and Luster because a condition precedent to a potential agreement never occurred–namely, that defendant did not bond out of jail. As a result, defendant argues, he was guilty of *attempted* solicitation of murder for hire, if he was guilty of anything. We reject defendant's argument.

¶ 21                1. *Statutory Language*

¶ 22       Section 8-1.2(a) of the Criminal Code of 1961 (Criminal Code) provides, as follows:

"A person commits the offense of solicitation of murder for hire when, with the intent that the offense of first degree murder be committed, he or she procures another to commit that offense pursuant to any contract, agreement, understanding, command, or request for money or anything of value." 720 ILCS 5/8-1.2(a) (West 2010).

¶ 23                2. *Standard of Review*

¶ 24       The parties disagree as to the appropriate standard of review. The State urges us to apply the usual standard used to review a challenge to the sufficiency of the evidence. Under that standard we ask whether, viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114, 871 N.E.2d 728, 740 (2007). Defendant, citing *People v. Giraud*, 2012 IL 113116, ¶¶ 4-6, 980 N.E.2d 1107, argues that the present case involves a question of statutory interpretation that should be reviewed *de novo*.

¶ 25       We agree with the State that the *Wheeler* standard is appropriate in this case. Whether an agreement existed was a question of fact for the jury, which decided it in the affirmative. The *Wheeler* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's determination that an agreement existed is entitled to the deference granted by the *Wheeler* standard.

¶ 26       Defendant argues that when the evidence is not in dispute, there is no need to defer to the jury's findings, and a court of review is free to determine on its own, with no deference to the fact finder, whether the evidence was sufficient to support the conviction. Some case law supports defendant's contention. See, *e.g.*, *In re Ryan B.*, 212 Ill. 2d 226, 231, 817 N.E.2d 495, 497-98 (2004) ("Because respondent's challenge to the sufficiency of the evidence against him

does not question the credibility of the witnesses, but instead questions whether the uncontested facts were sufficient to prove the elements of sexual exploitation of a child, our review is *de novo*."); *People v. Smith*, 191 Ill. 2d 408, 411, 732 N.E.2d 513, 514 (2000) ("Because the facts are not in dispute, defendant's guilt is a question of law, which we review *de novo*."). Defendant claims that because the evidence presented was audio-recorded, there is no dispute as to the facts and, therefore, no need to defer to the jury's finding of guilt. We disagree.

¶ 27    Although defendant is correct that the evidence–namely, the audio recordings–was not in dispute, the *inferences* to be drawn from those conversations were in dispute. As we stated previously, "[i]n determining a defendant's guilt, the trier of fact is entitled to draw reasonable inferences that flow from the evidence [presented]." (Internal quotation marks omitted.) *People v. Sorrels*, 389 Ill. App. 3d 547, 551, 906 N.E.2d 788, 792 (2009) (quoting *People v. Kirkpatrick*, 365 Ill. App. 3d 927, 929-30, 851 N.E.2d 276, 279 (2006)); see also *People v. Washington*, 2012 IL 110283, ¶ 60, 962 N.E.2d 902 ("It is the jury's function to weigh the evidence, assess the credibility of the witnesses, resolve conflicts in the evidence, and draw reasonable inferences therefrom."). Because drawing inferences from the evidence was a task for the jury, we apply the deferential *Wheeler* standard to review the jury's decision finding defendant guilty. See *Sorrels*, 389 Ill. App. 3d at 551, 906 N.E.2d at 792 ("[An] issue in this case is what inferences the jury could have reasonably drawn from the facts in this case as the jury determined those facts. Thus, the *Wheeler* standard of review applies ***.").

¶ 28    We note that deferring to the jury is particularly important when the jury is considering an audio-recorded statement as opposed to a written transcript. Spoken language contains more communicative information than the mere words because spoken language contains "paralanguage"–that is, the "vocal signs perceptible to the human ear that are not actual words." Keith A. Gorgos, *Lost in Transcription: Why the Video Record Is Actually Verbatim*, 57 Buff. L. Rev. 1057, 1107 (2009). Paralanguage includes "quality of voice (shrill, smooth, shaky, gravely, whiny, giggling), variations in pitch, intonation, stress, emphasis, breathiness, volume, extent (how drawn out or clipped speech is), hesitations or silent pauses, filled pauses or speech fillers (e.g., 'um/uhm,' 'hmm,' 'er'), the rate of speech, and extra-speech sounds such as hissing, shushing, whistling, and imitations sounds." Gorgos, *supra*, at 1108. The information expressed through paralanguage is rarely included in the transcript, as there is generally no written counterpart for these features of speech. Gorgos, *supra*, at 1109.

¶ 29    The jury has the responsibility to interpret the paralanguage and draw the appropriate inferences therefrom. In this case, the jury and this court both have had access to the same recordings of defendant's conversations with Lyons and Luster. However, we might reach different conclusions about the meaning of the conversations based on differing interpretations of the paralanguage involved. Under the principles of appellate review embodied in the *Wheeler* standard, this court is obliged to defer to the jury's interpretations. Therefore, contrary to defendant's contention, the jury had fact-finding work to do. In light of that work, the deferential *Wheeler* standard of review is applicable to our determination of the jury's decision that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt.

¶ 30                                      3. *Whether the Evidence Was Sufficient in This Case*

¶ 31    Applying the appropriate standard of review to defendant's claim, we ask whether, viewing the evidence–and the inferences to be drawn therefrom–in a light most favorable to

the State, any rational trier of fact could have found beyond a reasonable doubt the essential elements of solicitation of murder for hire. Defendant does not contest that the evidence was sufficient to prove that defendant and Luster were discussing the murder of Anderson. Instead, defendant argues that no "agreement" was reached between him and Luster. Therefore, the question we resolve on appeal is whether a rational juror could have found that an "agreement" existed between defendant and Luster that Luster would kill Anderson.

¶ 32        Defendant urges us to apply principles of contract law to determine whether an "agreement" existed. According to defendant, the term "agreement" in the solicitation of murder for hire statute should be defined the same as the definition of a contract under contract law. Thus, defendant cites *Lyntel Products, Inc. v. Alcan Aluminum Corp.*, 107 Ill. App. 3d 176, 180, 437 N.E.2d 653, 656-57 (1981), and argues that an agreement is not "effective" if a condition precedent to that agreement has not been performed. Applying *Lyntel* to the present case, defendant argues that his bonding out of jail was a condition precedent to the agreement between him and Luster that Luster would kill Anderson in exchange for $1,000. Defendant concludes that because the condition precedent was not met, there was no effective agreement and defendant was not proven guilty beyond a reasonable doubt of solicitation of murder for hire. Instead, defendant argues, the evidence proved him guilty at most of *attempted* solicitation of murder for hire, an offense recognized by *People v. Boyce*, 2015 IL 117108, ¶¶ 25-32, 27 N.E.3d 77.

¶ 33        We reject defendant's argument that principles of contract law should be applied to define the term "agreement" in the solicitation of murder for hire statute. Agreement is a term of common use, and a jury should need no help in understanding that term. See *People v. Sanchez*, 388 Ill. App. 3d 467, 477-78, 904 N.E.2d 162, 170 (2009) ("When words in a jury instruction have a commonly understood meaning, the court need not define them with additional instructions."). If the legislature had intended "agreement" to have a more technical meaning, it could have provided such a definition by statute. Likewise, had the legislature meant for agreement to take on the meaning of a contract as defined by contract law, it could have used the word "contract" instead of "agreement." The statute contains no indication that the legislature intended for the term "agreement" to incorporate the meaning of a "contract" as defined by contract law.

¶ 34        In further support of our decision, we note that adopting the principles of contract law to define "agreement" would require us to instruct the jury on contract principles such as "offer," "acceptance," "consideration," and "condition precedent." Although the legislature chose to define several terms in the Criminal Code (720 ILCS 5/2-1 to 2-22 (West 2010)), it did not provide definitions for "agreement" or any of the contract terms previously mentioned. The lack of definitions for those terms further supports our conclusion that the legislature intended the jury to give the term "agreement" its plain and ordinary meaning and not the meaning established legal principles have ascribed to a contractual agreement. In addition, defendant did not seek a jury instruction to define "agreement" in the trial court but, instead, chose to leave that definition for the jury.

¶ 35        In reaching this conclusion, we also note that in section 8-1.2(a) of the Criminal Code (720 ILCS 5/8-1.2(a) (West 2010)), the legislature uses the term "contract" but then immediately goes on to mention "agreement, understanding, command, or request for money or anything of value." By doing so, the legislature clearly meant this terminology to be far broader than the

term "contract" alone. This observation further supports our rejection of defendant's argument that the nuances of civil contract law should somehow apply to this section.

¶ 36    Having concluded that "agreement" was a term of common understanding for the jury to define, we determine further that the evidence presented here was sufficient for the jury to find beyond a reasonable doubt that an agreement existed between defendant and Luster. A rational juror could have found that defendant and Luster agreed that Luster would kill Anderson in exchange for $1,000 from defendant. Although defendant never spoke the word "kill," the jury could infer that defendant intended for Luster to kill Anderson based on defendant's statements that he wanted Anderson "gone completely" and that Anderson never be seen or heard from again. The fact that the arrangement seemed to be predicated upon defendant's release from jail did not preclude the jury from finding that an "agreement" existed between defendant and Luster. The evidence was therefore sufficient to prove defendant guilty beyond a reasonable doubt of solicitation of murder for hire.

¶ 37                    B. Posttrial Claims of Ineffective Assistance of Counsel

¶ 38    Defendant argues that the trial court failed to inquire into his posttrial claims of ineffective assistance of counsel. The State responds by arguing that defendant's claims were not sufficient to warrant an inquiry by the court. We agree with the State.

¶ 39    Under *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984), and its progeny, when a defendant makes a colorable posttrial claim that his counsel was ineffective, the trial court must conduct an inquiry–known as a *Krankel* hearing–to determine whether new counsel should be appointed to help defendant present that claim. However, a defendant's claim must meet certain minimum requirements to trigger an inquiry by the court. *People v. Ward*, 371 Ill. App. 3d 382, 431, 862 N.E.2d 1102, 1147 (2007).

¶ 40    "[A] *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention." (Internal quotation marks omitted.) *People v. Taylor*, 237 Ill. 2d 68, 76, 927 N.E.2d 1172, 1176 (2010) (quoting *People v. Moore*, 207 Ill. 2d 68, 79, 797 N.E.2d 631, 638 (2003)). However, a bald allegation that counsel was inadequate is insufficient to trigger a *Krankel* hearing. *People v. Radford*, 359 Ill. App. 3d 411, 418, 835 N.E.2d 127, 133 (2005). Instead, a defendant's claim must be specific and supported by facts. *Id.*

¶ 41    In *People v. Reed*, 361 Ill. App. 3d 995, 998-99, 838 N.E.2d 328, 331 (2005), after the defendant was found guilty, he wrote the trial court a letter stating that counsel was ineffective for failing to subpoena certain witnesses. The court did not respond to defendant's allegations and instead sentenced defendant. *Id.* On appeal, this court held that the defendant's "conclusory allegations" did not merit remand for a *Krankel* hearing because they did "not specify what the witnesses would have said on the stand or how they would have helped his case." *Id.* at 1003, 838 N.E.2d at 335. However, we noted "that if defendant can flesh out his claim with sufficient factual allegations, he may still petition for postconviction relief." *Id.* at 1004, 838 N.E.2d at 335.

¶ 42    In this case, defendant claimed that counsel was ineffective for failing to (1) secure transcripts of Lyons' sentencing hearing and (2) file an unspecified motion. Defendant did not explain what relevance Lyons' sentencing proceeding might have on defendant's case. Nor did defendant explain what kind of motion counsel should have filed or what effect that motion might have had on the outcome of the proceedings. Defendant's claims were bald allegations of ineffectiveness that did not necessitate a *Krankel* hearing. As in *Reed*, defendant's assertions

are conclusory and do not explain how the sentencing transcripts or the motion might have helped his case. Remand for a *Krankel* hearing is therefore unnecessary.

¶ 43 Defendant cites *People v. Peacock*, 359 Ill. App. 3d 326, 833 N.E.2d 396 (2005), in support of his argument that remand for a *Krankel* hearing is required. We disagree and find the facts of *Peacock* distinguishable. In *Peacock*, after being found guilty of home invasion and other crimes, defendant wrote a letter to the trial court containing the following language:

> " '[M]y attorney[,] John Taylor[,] did not represent [me] to the full[e]st of his ability[.] [T]he reason I say that is because he did not send out any [subpoenas] for all my [witnesses] and he also did not cross[-]examine the [witnesses] to prove [whether] their test[i]mony was cred[i]ble or not. [H]e would not ask any of the questions I wanted him to ask or show how the victim told the police and investigators two different stories in the motion of discovery. [He failed to elicit] the fact that I still lived in the house until the day I turned myself [in to] the Champaign County jail[.] [F]or that reason[,] I would like for you to grant me a new trial so I can have all of these things brought forth.' " *Id.* at 330, 833 N.E.2d at 400.

The trial court sentenced defendant without responding to the allegations of ineffective assistance contained in his letter. On appeal, this court found that the trial court failed to conduct a proper *Krankel* hearing and remanded for that purpose.

¶ 44 We conclude that the facts in *Peacock* are distinguishable from those of this case. In *Peacock*, the defendant provided more than mere bald allegations. He supported his allegations of ineffective assistance with facts to explain how counsel failed to cross-examine the witnesses and what a sufficient cross-examination would have revealed. The facts of *Peacock* are in contrast to this case, in which the defendant made generalized conclusory allegations without any factual support. Those allegations were insufficient to require a *Krankel* inquiry.

¶ 45                                    III. CONCLUSION
¶ 46 For the foregoing reasons we affirm the trial court's judgments. As part of our judgment, we award the State it $75 statutory assessment against defendant as costs of this appeal.

¶ 47        No. 4-14-0226, Affirmed.
¶ 48        No. 4-15-0133, Affirmed.